```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                          WACO DIVISION

 3   APPLIANCE COMPUTING III, INC. D/B/A SUREFIELD
                                     *
 4   VS.                             *    March 29, 2022
                                     *
 5   REDFIN CORPORATION              *  CAUSE NO. W-20-CV-376

 6            BEFORE THE HONORABLE ALAN D ALBRIGHT
                      PRETRIAL PROCEEDINGS
 7
     APPEARANCES:
 8
     For the Plaintiff:        Andrew DiNovo, Esq.
 9                             Christopher V. Goodpastor, Esq.
                               Nicole E. Glauser, Esq.
10                             DiNovo Price LLP
                               7000 N MoPac Expressway, Suite 350
11                             Austin, TX 78731

12   For the Defendant:        Ryan J. Marton, Esq.
                               Hector Ribera, Esq.
13                             Carolyn Chang, Esq.
                               Marton Ribera Schumann & Chang LLP
14                             548 Market St., Suite 36117
                               San Francisco, CA 94104
15
                               Darryl Adams, Esq.
16                             Slayden Grubert Beard PLLC
                               401 Congress Ave., Ste. 1650
17                             Austin, TX 78701

18                             Deron R Dacus, Esq.
                               The Dacus Firm, P.C.
19                             821 ESE Loop 323, Suite 430
                               Tyler, TX 75701
20
                               Matthew Scott Stevens, Esq.
21                             Karlee Nicole Wroblewski, Esq.
                               Nicholas Christopher Marais, Esq.
22                             Alston & Bird LLP
                               101 South Tryon St, Suite 4000
23                             Charlotte, NC 28280

24   Court Reporter:           Kristie M. Davis, CRR, RMR
                               PO Box 20994
25                             Waco, Texas 76702-0994
                               (254) 340-6114
```

1       Proceedings recorded by mechanical stenography, transcript

01:33  2  produced by computer-aided transcription.

01:33  3       (March 29, 2022, 9:05 a.m.)

09:06  4       DEPUTY CLERK:  Civil Action 6:20-CV-376, Appliance

09:06  5  Computing d/b/a Surefield versus Redfin Corporation.  Case

09:06  6  calls for pretrial conference.

09:06  7       THE COURT:  Good morning, everyone.  If I could have

09:06  8  announcements from counsel, please.

09:06  9       MR. DiNOVO:  Yes.  Good morning, Your Honor.  This is Drew

09:06  10  DiNovo.  I have with me my partners, Chris Goodpastor and Nicki

09:06  11  Glauser.

09:06  12       MR. ADAMS:  Good morning, Your Honor.  We're happy to be

09:06  13  live in Waco this morning.  I have with me Darryl Adams for

09:06  14  Redfin Incorporated.  I have with me today Mr. Deron Dacus.

09:06  15       MR. DACUS:  Good morning.

09:06  16       MR. ADAMS:  Ryan Marton, Hector Ribera and Carolyn Chang

09:06  17  of the Marton Ribera Chang firm.  And also Scott Stevens,

09:06  18  Karlee Wroblewski and Nick Marais of Alston & Bird.

09:06  19       THE COURT:  Okay.  Other judges -- not me, other judges

09:07  20  would make a comment on how many lawyers there are, but...

09:07  21       MR. STEVENS:  We knew we were safe here, Your Honor.

09:07  22       (Laughter.)

09:07  23       THE COURT:  I've gone through, and here are the -- I've

09:07  24  reviewed all of the motions in limine, and here are the rulings

09:07  25  I have.

09:07  1        There are a couple we're going to take up first, but with

09:07  2    regard to plaintiff's Motion in Limine No. 3 -- and by the way,

09:07  3    y'all keep track.  If I miss one that you think you have not

09:07  4    agreed to, if that makes sense, I'm going to skip the ones I

09:07  5    think are agreed to.

09:07  6        If I don't give you a ruling on something and you don't

09:07  7    think it's agreed to, let me know.  That's my mistake.  For

09:07  8    example, my understanding is 1 and 2 are agreed to.  So I --

09:07  9    but No. 3 is granted.

09:07  10       On No. 4 what my ruling is, it's granted, but essentially

09:07  11   what I wanted to point out was that it speaks about a specific

09:08  12   example, but at the end that was not disclosed in discovery.

09:08  13   Nothing is going to come in that was not disclosed in

09:08  14   discovery.

09:08  15       So I'm granting this motion in limine, but nothing is

09:08  16   coming in about anybody that was not produced during discovery.

09:08  17   So it's not limited to this.

09:08  18       If I understood the motion correctly, it was --

09:08  19   something's excluded, blah, blah, blah, blah, that was not

09:08  20   disclosed in discovery.  And I think that's just generally the

09:08  21   way I treat everything.

09:08  22       Motion in Limine No. 5 is granted.

09:08  23       6 was -- and 7 were agreed to.

09:08  24       No. 8 is denied.

09:08  25       No. 9 is granted.

09:08  1          No. 10 is granted.

09:08  2          No. 11 is granted.

09:08  3          No. 12 is granted.

09:08  4          No. 13, again, it begins with undisclosed/unelected and

09:09  5    goes from there.  Frankly, anything that was undisclosed or

09:09  6    unelected is not coming in.

09:09  7          So as I understand this motion in limine, it is prior art

09:09  8    indefiniteness and NIA allegations that were undisclosed and

09:09  9    unelected.  That's granted, but it would be granted whatever we

09:09  10   were talking about if it has not been disclosed properly during

09:09  11   discovery.

09:09  12         No. 14, again, undisclosed opinion testimony.  That's not

09:09  13   a motion in limine for me, that's a rule of my court.  And so,

09:09  14   now, if I haven't -- let me stop there.

09:09  15         If I haven't told you all, I know Mr. Dacus, for sure, has

09:09  16   been in my court in trial.  I'm not sure who else has.  If I

09:09  17   haven't explained to you how I anticipate you all will handle

09:10  18   putting on expert witnesses in terms of what is and what's not

09:10  19   in the report, what I anticipate the person on direct will do

09:10  20   is he'll ask a question or she'll ask a question and, if the

09:10  21   lawyer on the other side stands up and says, objection, Your

09:10  22   Honor.  That's not in his expert report, the person who asks

09:10  23   the question, because he will have put a footnote next to his

09:10  24   question, will be able to say, yes.  It is, Judge.  It's on

09:10  25   Page 13, Paragraph 2.

09:10  1      Because you should know when you ask the question that it

09:10  2  is -- I'm not telling you it has to be quoted in the report,

09:10  3  but you have to be able to come up to me and say, Judge, this

09:10  4  is where it was disclosed in the report.

09:10  5      Now, where it's a little squishier is if -- and this came

09:10  6  up yesterday in a pretrial hearing -- I think if there is

09:11  7  something that was directly questioned about in the deposition

09:11  8  where the questioner fully explored an expert's opinion on

09:11  9  something and for some reason that exact thing is not in the

09:11 10  report but you could persuade me that at the deposition the

09:11 11  person was fully able to explore the opinion, I probably would

09:11 12  allow that in as well, if that makes sense.

09:11 13      And what I'm saying is this, I'll give you an example,

09:11 14  maybe it'll help you put it more in context.

09:11 15      Yesterday one party was unhappy because the other party --

09:11 16  other parties' damages expert had said in his report, statement

09:11 17  of opinion, footnote technical expert.  Turns out, it was

09:11 18  omitted from the technical expert's report, which is

09:11 19  unfortunate.  I know none of the lawyers here would have

09:11 20  allowed that to happen.

09:11 21      But everyone agreed that at the deposition, because it had

09:12 22  been disclosed in that manner, that the party had been able to

09:12 23  both question the damages expert about what he'd been told and

09:12 24  asked the expert -- technical expert what he had told the

09:12 25  damages expert.  So I told them that was okay with me to the

09:12   1   extent it had been -- because that gave the other side notice.

09:12   2       So that's what I'm talking about with regard to what comes

09:12   3   in.  Otherwise, it's not -- to me, it's not a motion in limine

09:12   4   about undisclosed opinion testimony.  That's just not going to

09:12   5   be -- that's not a motion in limine because it's not going to

09:12   6   be admitted at all.

09:12   7       On No. 15, No. 15 is essentially the same thing.  The

09:12   8   motion in limine itself says NIAs not addressed, relied by

09:12   9   Redfin's damages expert.  It's essentially the same ruling.

09:12   10      If it wasn't relied on in the report and it wasn't

09:12   11  discussed in the manner I just said during the deposition --

09:12   12  this is true with any expert -- it's not going to come in.

09:13   13      On No. 16 I'm granting it, but I want to make very clear

09:13   14  that this is one where I think it is question-dependent.  So it

09:13   15  is a true motion in limine, meaning the plaintiff whose motion

09:13   16  it is should not go away thinking I have excluded it.  It's

09:13   17  just that if there's something in this area, either party can

09:13   18  approach the bench and tell me what they want to get into.  And

09:13   19  there's a chance information in 16 will come in, but I want you

09:13   20  to approach the bench first.

09:13   21      No. 17 is granted.

09:13   22      No. 18 is denied.

09:13   23      No. 19 is denied.

09:13   24      No. 20 is denied.

09:13   25      No. 21 was agreed to.

7

09:14   1          No. 22 is granted.

09:14   2          No. 23 is granted.

09:14   3          24 was agreed to.

09:14   4          Give me one second here.  I had some notes.  Let me -- I

09:14   5   understand that you all have agreed to 25 and 26 and 27 and 28.

09:14   6   But let me make a comment, couple comments.

09:14   7          On 25, I -- there are always problems here in this sense.

09:14   8   Mr. DiNovo, is the plaintiff a nonpracticing entity?

09:14   9          MR. DiNOVO:  No, Your Honor.  I think it's fair to say

09:14  10   that he practices the invention, but in a comparatively minor

09:14  11   way.

09:14  12          THE COURT:  Okay.  It doesn't matter to me what it is.

09:15  13   All I -- you be can be seated.  All I care about is this:  That

09:15  14   your inventor practices the invention in a small way is okay

09:15  15   for you to get into and them to get into.  I mean, that's just

09:15  16   the way it is.

09:15  17          Redfin's success is what it is.  And it's okay.  I mean,

09:15  18   Redfin's been very successful in their company.  And that --

09:15  19   what I fully anticipate you all avoiding is anything that I

09:15  20   might perceive to be pejorative in either direction about

09:15  21   either Redfin's success, the plaintiff's lack of success.

09:15  22          I mean, to the extent it is factual, to the extent it's

09:15  23   necessary, for example, in the damages expert's opinion, to

09:15  24   discuss in hypothetical negotiation, all that's fair.  But I

09:15  25   would certainly anticipate neither side being pejorative to the

09:15  1   other.

09:15  2        Okay.  Now, with respect to defendant's motions in limine,

09:16  3   No. 1 is granted.

09:16  4        No. 2, my understanding is agreed to.

09:16  5        We are going to take up No. 3.  We'll have argument on

09:16  6   No. 3.

09:16  7        No. 4 is granted.

09:16  8        No. 5 we're going to have arguments on.

09:16  9        No. 6 I'm going to take up arguments on.

09:16  10       So I'm happy to hear from counsel for defendant with

09:16  11  respect to Motion in Limine No. 3 which is an inducement theory

09:16  12  based on alleged direct infringement of Redfin and users.

09:17  13       I know I probably took -- y'all probably were not prepared

09:17  14  to do it in exactly the order that I am doing it in, and so

09:17  15  but...

09:17  16       MR. RIBERA:  Good morning, Your Honor.  My name is Hector

09:17  17  Ribera, and I'm counsel for Redfin.

09:17  18       With respect to Redfin's Motion in Limine No. 3, I think

09:17  19  the main issue here is that we do not dispute the fact that

09:17  20  they do have statements in their expert reports on their pay

09:17  21  periods mentioning an inducement theory with respect to end

09:17  22  users.  However, the underlying requirement of showing

09:18  23  infringement, direct infringement by the end users is missing.

09:18  24  So that's really the main point here.

09:18  25       And so to the extent that they have not shown through

09:18   1    discovery or in their expert report any theory under which an

09:18   2    end user directly infringes any single claim of any of the four

09:18   3    patents, then we are requesting that they're not allowed to

09:18   4    bring up in front of the jury the theories of infringement of

09:18   5    inducing those users to infringe.

09:18   6        I guess this is basically the main controlling case here,

09:18   7    we think is Centillion Data Systems where the Court there

09:18   8    provided -- I think it's blackletter law, but basically there's

09:18   9    got to be a theory where there's a direct infringer that

09:18   10   actually uses all portions of the claimed invention.

09:19   11       Here, all the claims that are asserted have different

09:19   12   portions.  And some of those portions may be used by the end

09:19   13   users, but there's no coherent, single theory where an end user

09:19   14   practices every single step of a method claim or uses every

09:19   15   single component of a computer system claim.

09:19   16       THE COURT:  Counsel, here's my problem.  Here's why I

09:19   17   asked for argument.  This doesn't really strike me as a motion

09:19   18   in limine.  This strikes me as a summary judgment motion.

09:19   19       I mean, what you're -- I understand what you're arguing.

09:19   20   I mean, I -- I've made this argument myself in other trials,

09:19   21   but when I made it, it was -- it was a motion for summary

09:19   22   judgment arguing this as a matter of law.

09:19   23       So help me out here.  Did you all file a motion for

09:19   24   summary judgment on this?  Am I going to take that up?

09:19   25       MR. RIBERA:  We did not file on this issue.  No, Your

09:19  1  Honor.

09:19  2      THE COURT:  Okay.  I mean, I'm going to assume,

09:20  3  Mr. DiNovo, you can correct me if I'm wrong, you all

09:20  4  strenuously disagree with their position, I take it?

09:20  5      MR. DiNOVO:  Yes, Your Honor.  So I agree that it's more

09:20  6  appropriately taken up as a matter of summary judgment.

09:20  7      We've consistently throughout the case alleged inducement.

09:20  8  It's never been -- there's never been a motion to dismiss, a

09:20  9  motion to strike of Dr. Melendez' report.

09:20  10      We've included lengthy descriptions of inducement in our

09:20  11  interrogatory responses to them and explained those theories.

09:20  12  So this MIL, frankly, comes as something of a surprise.

09:20  13      THE COURT:  I agree.  I'm going to deny this motion in

09:20  14  limine.

09:20  15      (Off-the-record bench conference.)

09:21  16      THE COURT:  The next motion in limine we need to take up

09:21  17  is No. 6.

09:21  18      Yes, ma'am.

09:21  19      MS. WROBLEWSKI:  Good morning, Your Honor.  Karlee

09:21  20  Wroblewski on behalf of Redfin.

09:21  21      THE COURT:  You might pull that microphone a little closer

09:21  22  to you.

09:21  23      That's better.  I'm trying to keep Kristie from yelling at

09:21  24  you.

09:21  25      MS. WROBLEWSKI:  Yeah.  I appreciate that as well.

09:21  1       So what we're seeking here is, as you know, the asserted

09:22  2  patents didn't issue until December of 2017.  And so with

09:22  3  respect to any evidence that is from before that time as it

09:22  4  relates to inducement or willfulness, we ask that that evidence

09:22  5  be excluded.

09:22  6       Specifically with respect to -- so as one example in

09:22  7  Dr. Melendez' report at Paragraphs 72 through 81, there's

09:22  8  several references to evidence that relate to inducement of --

09:22  9  Redfin's inducement of Matterport, the company that developed

09:22  10  the technology in this case to develop their technology in a

09:22  11  particular way.  Or examples of Redfin inducing a customer that

09:22  12  to practice the -- or practice the technology in a particular

09:22  13  way.

09:22  14       And what we're interested in is under -- making sure that

09:23  15  evidence that is from 2014 is not brought in because there's no

09:23  16  explicit tie between that evidence and the evidence as it

09:23  17  relates to infringement after the issuance of the patents.

09:23  18       THE COURT:  Here is the problem I have -- and I'll hear

09:23  19  from the plaintiff -- is I don't know -- I don't know that I

09:23  20  will know when the plaintiff is asking questions about what

09:23  21  predated the issuance of the patent, why they're asking those

09:23  22  questions.

09:23  23       And it seems to me there may be relevant reasons.  There

09:23  24  may be -- and so how do I distinguish -- how do I distinguish a

09:23  25  question that's being asked about activities that predate

09:23  1    December 5, 2017 from what is okay and what's not?

09:24  2         Because you're asking me -- what I don't think would be

09:24  3    efficient is every time that Mr. DiNovo or team wants to ask a

09:24  4    question about something that happened prior to that date, they

09:24  5    have to come up to the bench to ask my permission which is what

09:24  6    a motion in limine would do.

09:24  7         But how do I know when -- two questions:  How do I know

09:24  8    when what they're asking about is -- relates to something

09:24  9    that's inappropriate in your opinion?

09:24  10        And number two, given how hard it seems to me it would be

09:24  11   for me to understand that, why would it be the kind of thing

09:24  12   that was so prejudicial to your client that I would have to --

09:24  13   I would have to grant a motion in limine as opposed to you all

09:24  14   just standing up and objecting to its relevance when the

09:24  15   question is asked?

09:24  16        MS. WROBLEWSKI:  So with respect to appropriateness of --

09:25  17   or how you would deem whether or not it was appropriate, we

09:25  18   would expect that when that evidence was brought forth, that

09:25  19   the counsel for plaintiff would indicate as to why that links

09:25  20   to the activity post 2017.  Either through pointing to evidence

09:25  21   that indicates that the same was true or testimony that

09:25  22   indicates that the same practicing was true post 2017.

09:25  23        THE COURT:  Okay.  I'm not going to do that.  So how

09:25  24   might -- why don't you answer my second question?  Mr. DiNovo

09:25  25   asks your -- something of your client, what his job was prior

09:25  1   to December 5th of 2017.  Okay or not okay?

09:25  2        MS. WROBLEWSKI:  That would be fine to ask what his job

09:25  3   was.

09:25  4        THE COURT:  That's my point.  And so I -- okay.  I'm going

09:25  5   to overrule this, if you -- as a motion in limine.  If you -- I

09:26  6   get what you're saying.  And if you feel that either a fact

09:26  7   witness or, more likely, an expert is going down a path of --

09:26  8   not you, you, but if the defendant believes that, just object,

09:26  9   and if at some point you, the defendant, believes that it is

09:26  10  becoming prejudicial because a jury might be confused about

09:26  11  what someone is talking about, just approach the bench and I'll

09:26  12  address it that way.

09:26  13       But I see no way to -- I see no way to police No. 6.  I

09:26  14  get there are reasons that things will not be admissible for,

09:26  15  and so it's going to be question-dependent, I think.

09:26  16       MS. WROBLEWSKI:  Thank you, Your Honor.

09:26  17       THE COURT:  Have I covered everything?  I feel like I

09:26  18  skipped something.

09:26  19       MR. DACUS:  I had in my notes, Your Honor, you said we

09:26  20  would take up Redfin's MIL No. 5.

09:26  21       THE COURT:  That's it.  I knew I had three, so I skipped

09:27  22  over one.  Okay.  Give me one second.

09:27  23       Okay.  Very good.  And finally, yes.  And this is probably

09:27  24  the one I most wanted to hear about.  So Redfin's Motion in

09:27  25  Limine No. 5 is alleged copying of the products, and I'm happy

09:27  1    to hear argument.

09:27  2        MR. MARTON:  My name is Ryan Marton.  I'm here on behalf

09:27  3    of Redfin.  So Motion in Limine 5 actually ties into our

09:27  4    motion -- it's basically a Daubert motion on 150, Docket 154.

09:27  5        THE COURT:  Then let me ask you this:  Would it make more

09:27  6    sense to you -- and I'm happy to do it whichever you think is

09:27  7    more efficient.  Would it be more efficient to take up the

09:27  8    Daubert?

09:27  9        MR. MARTON:  I actually think it's efficient to address it

09:27  10   right now.  It's an isolated issue.

09:27  11       THE COURT:  Okay.

09:27  12       MR. MARTON:  Surefield in its operative complaint and in

09:27  13   its expert report from Dr. Melendez asserts that Matterport

09:28  14   and/or Redfin copied Surefield's 2014 virtual tour product.

09:28  15   But -- and their argument is -- for relevance is that it

09:28  16   relates to objective indicia of nonobviousness, something that

09:28  17   copying does relate to.  That's not in dispute.

09:28  18       But in order to be relevant, that copying has to be of a

09:28  19   commercial embodiment of the asserted patents, can't just be

09:28  20   some product that has no relation to the case.

09:28  21       And here they have not established that that commercial

09:28  22   embodiment is, in fact -- well, that product is a commercial

09:28  23   embodiment of the patents in this case.

09:28  24       That requires expert testimony.  Their expert would have

09:28  25   to opine and map the claims of their own patents to their own

09:28   1   product and say, this is a commercial embodiment.

09:28   2       And we asked with interrogatories that they do such a

09:29   3   mapping as well.  They did not provide such a mapping.

09:29   4   Dr. Melendez, Surefield's technical expert in this case, gave

09:29   5   no opinion whatsoever about whether or not the Surefield 2014

09:29   6   product was a commercial embodiment of any claim of the

09:29   7   patents.

09:29   8       Now, there was one interrogatory response where they did

09:29   9   allege in a conclusory fashion that the 2014 product was a

09:29   10   commercial embodiment, but they didn't explain why.  And one of

09:29   11   the inventors during deposition did allege that the 2014

09:29   12   product was a commercial embodiment, but he could not explain

09:29   13   why.

09:29   14       So without the mapping of the 2014 commercial product to

09:29   15   the claims, we can't actually assert that it's a commercial

09:29   16   embodiment, and any alleged copying of such product is

09:29   17   irrelevant.

09:30   18       And we would like that the Court exclude any testimony,

09:30   19   argument, evidence suggesting that either Redfin or Matterport

09:30   20   copied the 2014 Surefield product.

09:30   21       THE COURT:  So it seems -- I'm sorry.  It seems to me that

09:30   22   this is more of a Daubert issue.

09:30   23       MR. MARTON:  It is.

09:30   24       THE COURT:  And so let's take it up in that -- I mean,

09:30   25   again, because -- it seems to me that there may be questions

| | | |
|---|---|---|
| 09:30 | 1 | about this that would not be objectionable.  I mean, they might |
| 09:30 | 2 | be relevant for reasons that you're not concerned about, but |
| 09:30 | 3 | what you really care about is the opinion, I think. |
| 09:30 | 4 | MR. MARTON:  Well, it is the opinion.  I actually will |
| 09:30 | 5 | concede that the Daubert's probably a little more narrow than |
| 09:31 | 6 | the motion in limine. |
| 09:31 | 7 | THE COURT:  And here's why it seems to me that if you're |
| 09:31 | 8 | successful on your Daubert motion, then it would be very |
| 09:31 | 9 | difficult for the plaintiff to establish why. |
| 09:31 | 10 | MR. MARTON:  Absolutely. |
| 09:31 | 11 | THE COURT:  It seems to me to give me the ability to have |
| 09:31 | 12 | a much brighter line on what is and what is not -- and |
| 09:31 | 13 | plaintiff a brighter line of what is and is not admissible -- |
| 09:31 | 14 | MR. MARTON:  Okay. |
| 09:31 | 15 | THE COURT:  -- of what they can go into which is, you |
| 09:31 | 16 | know, I was worried when I was in your shoes that I would |
| 09:31 | 17 | violate a motion when I was thinking about something coming in |
| 09:31 | 18 | for one reason.  And this would be a pretty bright line. |
| 09:31 | 19 | So why don't we -- who -- |
| 09:31 | 20 | Regan, which -- do you know which Daubert motion this is? |
| 09:31 | 21 | MR. MARTON:  I can give you the docket number. |
| 09:31 | 22 | THE COURT:  This is just a test for my clerk to see if he |
| 09:31 | 23 | was awake. |
| 09:31 | 24 | (Laughter.) |
| 09:31 | 25 | MR. MARTON:  Don't mean to be interrupt. |

09:31  1          (Off-the-record discussion.)

09:32  2          MR. MARTON:  Should we address it with the Daubert or do

09:32  3  we --

09:32  4          THE COURT:  Yeah.  Let me make sure we have --

09:32  5          (Brief off-the-record discussion.)

09:32  6          MR. DACUS:  Your Honor, also along the lines of what the

09:32  7  Court just said of not wanting to violate limines

09:32  8  inadvertently, I do have one question with respect to one of

09:32  9  the ones that was granted if I could ask the Court for some

09:33  10  clarification.

09:33  11          THE COURT:  Sure.

09:33  12          MR. DACUS:  Thank you, Your Honor.

09:33  13          So specifically, Your Honor, we're talking about

09:33  14  Surefield's Motion in Limine No. 5.

09:33  15          THE COURT:  Okay.

09:33  16          MR. DACUS:  Which relates to alleged copying by the

09:33  17  plaintiff of Matterport which is a third party's technology.

09:33  18  And I think it's probably helpful to give you two minutes of

09:33  19  background on just the high-level facts of the case.

09:33  20          So the accused technology in the cases is this 3D virtual

09:33  21  tours on real estate websites.  Redfin is an online real estate

09:33  22  company, the defendant Redfin's an online real estate company.

09:33  23  They buy the accused technology from Matterport.

09:33  24          THE COURT:  I think you are -- let me say this, and let me

09:33  25  see if you still have a problem.

| | | |
|---|---|---|
| 09:33 | 1 | MR. DACUS:  Yes, sir. |
| 09:33 | 2 | THE COURT:  This is -- this kind of motion for me, it's |
| 09:34 | 3 | just a motion in limine.  I'm not excluding this evidence.  But |
| 09:34 | 4 | when I read this, I have too hard a time figuring out exactly |
| 09:34 | 5 | whether or not I would admit it at trial. |
| 09:34 | 6 | This is a motion in limine.  If you all want to put on |
| 09:34 | 7 | this evidence, you just have to approach bench.  And I find |
| 09:34 | 8 | that when I'm -- when I've heard the opening arguments, when |
| 09:34 | 9 | I'm hearing the evidence and you come up and say, Judge, we are |
| 09:34 | 10 | going to get into this issue and here's why it's relevant, then |
| 09:34 | 11 | Mr. DiNovo argues why it's not, then I can decide whether or |
| 09:34 | 12 | not it'll be admitted. |
| 09:34 | 13 | This is just 5 and most of these are just motions in |
| 09:34 | 14 | limine. |
| 09:34 | 15 | MR. DACUS:  Okay. |
| 09:34 | 16 | THE COURT:  Meaning you can't bring it up during opening |
| 09:34 | 17 | argument, but I'm not excluding anything about this. |
| 09:34 | 18 | MR. DACUS:  Understood, Your Honor.  And I wanted to be |
| 09:34 | 19 | clear with the Court that we had no intention of using any |
| 09:34 | 20 | pejorative terms like "copyist" or "espionage."  I think that's |
| 09:35 | 21 | referenced in the motion. |
| 09:35 | 22 | We do think the evidence itself is absolutely relevant and |
| 09:35 | 23 | critical.  And that's what I was trying to understand, is the |
| 09:35 | 24 | Court saying, don't call them bad names, which we agree, we |
| 09:35 | 25 | would never do in the first place; or is the Court saying, this |

09:35   1   evidence -- and I could explain to the Court why it's relevant.

09:35   2   Are you saying that relevant -- that --

09:35   3        THE COURT:  I'll decide that once you try to put it in and

09:35   4   tell me --

09:35   5        MR. DACUS:  Understood.

09:35   6        THE COURT:  -- exactly through the specific witness why

09:35   7   you think it's admissible.

09:35   8        Mr. DiNovo?

09:35   9        MR. DiNOVO:  Yes, Your Honor.  I have a quick

09:35   10  clarification question as well.

09:35   11       THE COURT:  Okay.

09:35   12       MR. DiNOVO:  This relates to MIL No. 4 and --

09:35   13       THE COURT:  Whose MIL?

09:35   14       MR. DiNOVO:  Redfin's MIL, that we can't use undisclosed

09:35   15  3D models.

09:35   16       And I know it has that word you don't like, "undisclosed,"

09:35   17  but let me -- if I could just give you 30 seconds of

09:35   18  explanation here.

09:35   19       So let me see if I can get our -- so the situation here --

09:36   20  and I think we were actually reasonably close to an agreement

09:36   21  with the other side is -- did this publish?

09:36   22       (Clarification by the reporter.)

09:36   23       MR. DiNOVO:  So the situation here is, in our expert

09:36   24  report, we used a number of their models from their website,

09:36   25  and we intend to show the jury sort of how it works and to run

09:36  1   through one of the models.

09:36  2       Well, these models have been disabled on Redfin's website.

09:36  3   And so we told them, well, look.  We either want the models in

09:36  4   our expert report or to pick some that are active now.  And

09:36  5   they told us, effectively, I think, either one of those two is

09:36  6   fine with us.  And what they told us was, go use the Matterport

09:36  7   link.

09:36  8       Well, one of the things in their trial is that -- I think,

09:36  9   that we should have sued Matterport, even though Redfin scans

09:36  10  everything and presents it to the users and all that stuff, but

09:37  11  we don't want to use the Matterport link, we want to use the

09:37  12  Redfin link and they've disabled it.

09:37  13      So we just want to be able to use a Redfin model, which

09:37  14  we've got five of them that have been disabled, or an

09:37  15  alternative model that's current.

09:37  16      THE COURT:  Let me hear a response from counsel.  Yes,

09:37  17  sir.

09:37  18      MR. RIBERA:  If I may, Your Honor.  Hector Ribera --

09:37  19      THE COURT:  And, Mr. DiNovo, you want to use them simply

09:37  20  as demonstratives, or do you want them to -- I'm not sure --

09:37  21  are they capable of -- are they the kind of physical exhibits

09:37  22  that could be even admitted?  So I'm not sure...

09:37  23      MR. DiNOVO:  No.  I think it would be as a demonstrative,

09:37  24  Your Honor.

09:37  25      THE COURT:  Okay.  Thank you.

21

09:37  1        MR. RIBERA:  Your Honor, Hector Ribera.

09:37  2        So the issue here is that these models are not Redfin's

09:37  3   models.  They characterize them as Redfin models, but

09:37  4   Matterport is the provider of these models.  Matterport is a

09:38  5   company that keeps these models and access to the models is

09:38  6   always through the Matterport link.

09:38  7        THE COURT:  So I don't know how to resolve this.

09:38  8   Mr. DiNovo just said he wants to use Redfin models, and you're

09:38  9   saying they're not Redfin models.  And I don't know what either

09:38 10   side wants me to do.

09:38 11        MR. RIBERA:  If I can just clarify, Your Honor.  The model

09:38 12   they use in their expert report, it's online, it's on your

09:38 13   screen right now, and it's active.  So that's the same model.

09:38 14        THE COURT:  Well, I thought I understood the Internet, and

09:38 15   I may not.  So what I heard Mr. DiNovo say is that these models

09:38 16   were on the Redfin website.  And in other words, if I went to

09:38 17   Redfin, I don't really know what Redfin is, but if I went to

09:38 18   Redfin and figure out how to use it, if I have one of my law

09:38 19   clerks go to Redfin for me and use it, they would have been

09:39 20   able to find the models on Redfin that -- that the plaintiffs

09:39 21   want to use.  And what Mr. DiNovo said was the models that were

09:39 22   on Redfin.com have been disabled and those are the ones they

09:39 23   want to be able to use to show the jury that Redfin, you guys,

09:39 24   the defendant in the case, had these models on there -- on

09:39 25   their website.

22

09:39    1         So my question to you is:  Did you all -- did Redfin have

09:39    2    these models on the -- if I went to Redfin.com, would they be

09:39    3    on Redfin's --

09:39    4         MR. RIBERA:  The models would never be on Redfin website,

09:39    5    there would be a link from the -- it's kind of like if you go

09:39    6    to go Google and you search and you get a link, and then it

09:39    7    takes you to another website.  It's the same thing.

09:39    8         On Redfin, you would search, you would find a particular

09:39    9    house, and there would be a link to the model, which is held by

09:39   10    Matterport.

09:39   11         THE COURT:  So I don't have any idea how you guys want me

09:39   12    to rule because --

09:39   13         MR. DiNOVO:  Well, Your Honor, if I could respond.

09:39   14         You never leave Redfin's website.  This is false.  So

09:40   15    there's two ways to do this on Redfin.

09:40   16         You go to Redfin.com with a browser, any normal browser,

09:40   17    you stay on Redfin.com, see their main listing page.  It has

09:40   18    all the information about the house, some of which is not

09:40   19    related to the 3D model, some of which is the 3D model.  They

09:40   20    paint an iframe on their main listing page where you run

09:40   21    through the tour on Redfin.com.

09:40   22         The alternative is that you use the Redfin app, which is

09:40   23    specially designed to present the 3D model along with all this

09:40   24    information.  So they want to force us to go to -- because it's

09:40   25    consistent with their trial theme, they want to disable the

09:40  1    evidence and force us to go to Matterport.com.

09:40  2         MR. RIBERA:  Not at all.  That's just not the way it

09:40  3    works.  There's only a link -- the models are always in

09:40  4    Matterport and Redfin never has these models.  They always have

09:40  5    to go through the link to Matterport in order to see the model.

09:40  6         But the fact that there's an iframe doesn't mean anything.

09:40  7    It's just a link to the Matterport model.

09:40  8         The issue here also is we're willing to work with them on

09:40  9    we've been talking about finding an alternative model that's

09:41  10   active to go through the link on the Redfin website.  But they

09:41  11   also want to get models for third parties that are not even

09:41  12   Redfin.

09:41  13        THE COURT:  Mr. DiNovo, did you have someone -- did your

09:41  14   expert go through this exercise?

09:41  15        MR. DiNOVO:  Yes.  He took screenshots in his expert

09:41  16   report of Redfin.com.  There's probably 50 of them.  Those

09:41  17   links, even during his deposition when they were asking him to

09:41  18   point out things in the model, they had been disabled by

09:41  19   Redfin.

09:41  20        THE COURT:  I will allow your expert to -- Mr. DiNovo,

09:41  21   since I don't know how to solve this, I will allow your expert

09:41  22   to go through his methodology and say what he did.  And if the

09:41  23   defendant wants to cross-examine him about what he did and say

09:41  24   it's not Redfin, you can do it that way.

09:41  25        MR. DiNOVO:  Okay.  Very good, Your Honor.

09:41   1       THE COURT:  So I'm going to reverse myself on Motion in

09:41   2   Limine No. 4.  Plaintiff's expert can certainly go through and

09:41   3   explain what he did.  And you all can fight in front of the

09:41   4   jury whether or not that's Redfin or somebody else.

09:41   5       MR. DiNOVO:  I'm sure that'll happen.  Thank you, Your

09:42   6   Honor.

09:42   7       THE COURT:  Okay.  Now, I think we were about to take

09:42   8   up --

09:42   9       MR. GOODPASTOR:  Your Honor, if we could have one more

09:42   10  clarification on defendant's MIL No. 1, I'll make it very

09:42   11  quick.

09:42   12      THE COURT:  Okay.

09:42   13      MR. GOODPASTOR:  Defendants -- Chris Goodpastor for

09:42   14  plaintiff Surefield.

09:42   15      Defendant's MIL No. 1 related to the PTAB decisions.

09:42   16      The only issue that we wanted to get clarification on is

09:42   17  the issue of impeachment and credibility of Dr. Furukawa.

09:42   18  Dr. Furukawa is a former Google employee that Redfin intends to

09:42   19  present, according to their disclosures, to testify on the

09:42   20  prior art.  Although we don't think that's allowed.

09:42   21      Nonetheless, Dr. Furukawa was also the expert hired by

09:42   22  Redfin's counsel in the IPRs and was a paid expert, gave an

09:42   23  opinion that was summarily rejected by the PTAB.  We think we

09:42   24  should be able to impeach him with that information.

09:42   25      THE COURT:  Say that last part again.

25

| | | |
|---|---|---|
| 09:42 | 1 | MR. GOODPASTOR:  We believe we should be able to impeach. |
| 09:42 | 2 | THE COURT:  No.  I heard that part. |
| 09:42 | 3 | MR. GOODPASTOR:  He delivered a declaration -- he was paid |
| 09:42 | 4 | to deliver a declaration in the IPRs on references and |
| 09:43 | 5 | combinations that are asserted by Redfin here.  And that |
| 09:43 | 6 | PTAB -- |
| 09:43 | 7 | THE COURT:  Now, that's something -- let me -- okay.  That |
| 09:43 | 8 | was not my understanding.  My understanding was that the -- |
| 09:43 | 9 | that the -- my understanding there was no direct overlap.  And |
| 09:43 | 10 | so if I'm wrong, we do need to take this up. |
| 09:43 | 11 | My understanding was that the defendant's expert is not |
| 09:43 | 12 | going to present to the jury any identical bit of -- |
| 09:43 | 13 | invalidating art that they presented during the PTAB. |
| 09:43 | 14 | MR. GOODPASTOR:  Respectfully, we think that's incorrect, |
| 09:43 | 15 | Your Honor. |
| 09:43 | 16 | THE COURT:  Okay.  So here's what we're going to do on |
| 09:43 | 17 | this, because I can't -- again, I can't fix this. |
| 09:43 | 18 | Obviously the defendant's going to put their expert on. |
| 09:43 | 19 | That's the order of it.  After -- we'll hear what he tells to |
| 09:43 | 20 | the jury.  If there's anything that he discusses in front of |
| 09:44 | 21 | the jury that you can show me would be impeached by what he |
| 09:44 | 22 | said in his -- whatever.  I don't know what it is that they |
| 09:44 | 23 | give to the PTAB. |
| 09:44 | 24 | But if there's something where there's the same art that |
| 09:44 | 25 | was considered by the PTAB -- the exact same art that was |

09:44   1   considered by the PTAB and rejected, I'll take it up at that

09:44   2   time, after I hear what the defendant's expert puts on the

09:44   3   witness stand.

09:44   4        MR. GOODPASTOR:  Understood.

09:44   5        MR. MARTON:  May I approach?

09:44   6        THE COURT:  Yes.

09:44   7        MR. MARTON:  I think there may be a little different view

09:44   8   on this one point.

09:44   9        Matterport -- nonparty Matterport filed the IPRs.  Their

09:44   10  expert was Dr. Furukawa in the IPRs.  Dr. -- Matterport and

09:44   11  Dr. Furukawa over here, IPRs over here.

09:44   12       Dr. Furukawa will testify for Redfin in this trial, not as

09:44   13  an expert.  He's not going to talk about invalidity.  He's

09:44   14  going to talk about his experience as a developer at Google.

09:44   15  That's it.

09:44   16       So he's not going to talk about the IPRs, he's not going

09:45   17  to --

09:45   18       THE COURT:  Then it's not going to come in.

09:45   19       MR. MARTON:  Right.  With respect to Redfin's expert, he

09:45   20  is not relying on the exact IPR grounds at all.  He is relying

09:45   21  on a few of the references but in combination with the system.

09:45   22       So a different combination, so it shouldn't come up.

09:45   23       THE COURT:  I think I just -- that's, I think --

09:45   24       MR. MARTON:  I just wanted --

09:45   25       THE COURT:  -- the exact way I just ruled.  I'm following

09:45  1   what you all are saying.  I'm -- yes.

09:45  2        MR. MARTON:  Okay.

09:45  3        THE COURT:  I won't know what -- I won't know whether or

09:45  4   not what the plaintiff wants to put on is admissible until we

09:45  5   hear from your expert.

09:45  6        MR. MARTON:  Thank you.

09:45  7        THE COURT:  After we hear from your expert, if they can

09:45  8   persuade me that there's something that is so identical between

09:45  9   what was at the PTAB and what he told the jury that it's fair

09:45  10  to be impeached by, you all can argue at that point.  But we'll

09:45  11  have his testimony at that point.

09:45  12       And I'm also giving you all a roadmap of what to avoid

09:45  13  having your expert -- he should be very careful in what he says

09:45  14  because that's the trap you all could set.

09:46  15       MR. MARTON:  Thank you.

09:46  16       THE COURT:  Okay.  Okay.  Daubert motion?

09:46  17       (Off-the-record bench conference.)

09:46  18       THE COURT:  Yes, sir.

09:46  19       MR. MARTON:  So I believe we're talking about Docket 85,

09:46  20  Redfin's motion to exclude certain testimony of Dr. Melendez.

09:47  21       There are three areas of testimony that Dr. Melendez

09:47  22  proposes to provide at trial that Redfin has issue with.  I'll

09:47  23  start with the one that was addressed in the motion in limine,

09:47  24  might as well begin there since I began the argument with that.

09:47  25       As I noted before, as purported evidence of secondary

09:47  1    indicia of nonobviousness, Dr. Melendez asserts that in 2014

09:47  2    Matterport, and maybe Redfin, copied Surefield's product, but

09:47  3    he comes to this conclusion without having ever established

09:47  4    that Surefield's product was an actual commercial embodiment of

09:47  5    any claim of any of the asserted patents.

09:47  6         He has no analysis whatsoever mapping any of the asserted

09:47  7    claims to the 2014 Surefield product or any Surefield product

09:48  8    for that matter.  And therefore, any opinion that Redfin and/or

09:48  9    Matterport copied the 2014 Surefield product is irrelevant.

09:48  10   And this is established Federal Circuit law cited throughout

09:48  11   our brief that I don't think is worth going through.

09:48  12        And that's our position on that point.

09:48  13        If we want to take them point by point, we can, or if

09:48  14   you'd like me to move into the other arguments, I can.

09:48  15        THE COURT:  I'm not sure what you mean by that exactly.

09:48  16        MR. MARTON:  Oh, so there are three areas of testimony

09:48  17   we're challenging.  They're independent, they're not

09:48  18   intertwined.  So it might be easier to address them one by one.

09:48  19        THE COURT:  Okay.  No, no.  I'll take them all up.

09:48  20        MR. MARTON:  Oh.  All of them at once.

09:48  21        So that's the first issue.

09:48  22        The second area of testimony that Dr. Melendez provides

09:48  23   that is improper is a series of legal conclusions about the

09:48  24   legal relationship between Redfin and Matterport.

09:49  25        THE COURT:  This is the technical expert?

09:49  1      MR. MARTON:  Yeah, the technical expert.  And these are

09:49  2  very strong legal conclusions.  In his infringement report

09:49  3  he -- actually, yeah.  In his infringement report at Paragraph

09:49  4  105 he asserts that Redfin and Matterport are in a contractual

09:49  5  and/or agency relationship relating to the relationship --

09:49  6  relating to the implementation and use of 3D walkthrough by

09:49  7  Redfin on its website.

09:49  8      In Paragraph 106 he says Matterport's performance of any

09:49  9  step of the asserted method claim is pursuant to its

09:49  10  contractual agreements and/or agency relationship with Redfin.

09:49  11      He goes on --

09:49  12      THE COURT:  I think I got that.

09:49  13      MR. MARTON:  Yeah.  The point is he asserts there's a

09:49  14  contractual relationship, the nature of the contractual

09:49  15  relationship, what is done pursuant to the contractual

09:49  16  relationship, that there is a joint --

09:49  17      THE COURT:  And he has no law degree.

09:49  18      MR. MARTON:  Yeah.  He is not a lawyer.

09:50  19      THE COURT:  What's your next issue?

09:50  20      MR. MARTON:  The last issue is with respect to

09:50  21  Dr. Melendez' proposed testimony regarding the economic and

09:50  22  commercial impact and consumer demand for 3D virtual tour

09:50  23  technology.  What he does is he parrots studies, third-party

09:50  24  studies about demand for virtual tours, and asserts that this

09:50  25  is -- the accused technology and the patented technology are

09:50 1    important for consumer demand.  It's beyond the scope of his

09:50 2    expertise.

09:50 3         THE COURT:  What is his background?

09:50 4         MR. MARTON:  He has a background -- he's an electrical

09:50 5    engineer.  And he is a expert in the areas -- purported expert

09:50 6    in the areas of imaging, computing and communications

09:50 7    technology.

09:50 8         THE COURT:  What I'm saying is, does he have any

09:50 9    personal -- is his background such that he was in the business

09:50 10   himself and might --

09:50 11        MR. MARTON:  Real estate business?  No.

09:50 12        THE COURT:  Okay.

09:50 13        MR. MARTON:  He has sold his own home before.

09:50 14        THE COURT:  Okay.  Okay.

09:50 15        Anything else we need to take up?

09:50 16        MR. MARTON:  That's it.

09:51 17        THE COURT:  I'll hear a response.

09:51 18        MR. GOODPASTOR:  Chris Goodpastor.  I'll address them in

09:51 19   order.

09:51 20        The first one concerns the copying opinion.  Dr. Melendez

09:51 21   gives an opinion that Redfin and Matterport copied Surefield's

09:51 22   product.  But this is a clear case of Redfin trying to attack

09:51 23   the sufficiency of an evidence through either a motion in

09:51 24   limine or a Daubert motion.

09:51 25        The case we cited out of the Northern District, Nortek

09:51  1   versus Energy Lab at 2016 Westlaw 3856250, addresses this issue

09:51  2   fairly head on.  It says, look, there may be several elements

09:51  3   to the claim of copying as a nonobviousness factor.  But the

09:51  4   expert doesn't have to testify upon all those elements.  We can

09:51  5   rely on other evidence to satisfy other elements.

09:51  6        So Dr. Melendez testifies on Element B, but Element A,

09:52  7   which is what they're complaining about, whether the product

09:52  8   copied was actually an embodiment of the asserted claims, can

09:52  9   be established by other evidence.  And that evidence can be the

09:52 10   testimony of the inventor, Mr. Eraker.

09:52 11        And they've actually deposed Mr. Eraker on this.  And in

09:52 12   his deposition Mr. Eraker said, yes, I believe the Surefield

09:52 13   product did embody one of the claims.

09:52 14        And, in fact, they asked an interrogatory on this issue as

09:52 15   well, and asked him to outline how the products satisfy the

09:52 16   claims.  And we provided a response to that.

09:52 17        So this idea that somehow Mr. Melendez -- or Dr. Melendez

09:52 18   has to provide all of the evidence on this claim is just

09:52 19   untrue.  He can provide his opinion on a portion of the

09:52 20   evidence.  And the fact that it's -- the other evidence is

09:52 21   coming from somewhere else doesn't affect the admissibility of

09:52 22   that opinion.

09:52 23        I want to next talk about the technical basis for the

09:52 24   direction and control over Matterport.

09:53 25        So Redfin attempts to characterize this as a legal one,

09:53   1   but it's really not a legal one.  If you look at Paragraph 111

09:53   2   of Dr. Melendez' infringement report, he goes through and

09:53   3   details how Matterport is under the technical control of Redfin

09:53   4   when a person goes to the Redfin website and clicks on Redfin's

09:53   5   3D walkthrough tour.

09:53   6        That clicking sets in motion a process by which Redfin

09:53   7   controls the conduct by Matterport that is contributing to the

09:53   8   infringement here.  And that's what Dr. Melendez lays out.

09:53   9        Now, does he announce that there are contracts?  Does he

09:53  10   announce that there are relationships?  Yes.  Because that

09:53  11   technical testimony is relevant to those relationships.

09:53  12        But is he providing a contract interpretation?  No.  Is he

09:53  13   providing an opinion on the law?  No.  He's allowed to give

09:53  14   context to his technical opinions, and that's what he's doing,

09:53  15   Your Honor.

09:53  16        And I'll give you a little bit more background about

09:53  17   Dr. Melendez.  He's not only a Ph.D. computer scientist and

09:54  18   electrical engineer from Stanford and MIT, he also has

09:54  19   significant business background.  He started two different

09:54  20   companies --

09:54  21        THE COURT:  Hold on one second.

09:54  22        (Off-the-record bench conference.)

09:54  23        THE COURT:  Here's what I'm going to do with respect to

09:54  24   this expert:  I'm going to deny the Daubert motions.  But,

09:55  25   again, there is much of what use the defendant is concerned

09:55  1   about that I think would be objectionable.  There's much that

09:55  2   you suggested he might say which I think would be fine.

09:55  3        And so you are -- the defendant is certainly free to

09:55  4   object -- for example, I'm certainly not going to allow him to

09:55  5   give a legal opinion.  But if he wants to do as you suggest and

09:55  6   say, you know, how technically it works between the two

09:55  7   companies.  And, you know, if he's simply giving -- if he's

09:55  8   giving a technical opinion or a factual opinion, he's free to

09:55  9   do that.  If he goes beyond that and you want to object, it's

09:55  10  outside of his expertise of expertise, you'll object and I'll

09:56  11  sustain it if I think it's objectionable.  So...

09:56  12       MR. GOODPASTOR:  Understood.  Thank you.

09:56  13       THE COURT:  So now let me find my cheat sheet of what

09:56  14  we're here for.  And so I have probably what you all

09:56  15  anticipated we would take up first.

09:56  16       Before I do that, let me -- did I go through all the

09:56  17  motions in limine?  Have we resolved all those?

09:56  18       MR. DACUS:  From our perspective we believe the answer's

09:56  19  yes, Your Honor.

09:56  20       MR. DiNOVO:  Yes, Your Honor.

09:56  21       THE COURT:  Okay.  Redfin's motion for summary judgment

09:56  22  regarding noninfringement.  I'm happy to hear argument on that.

09:56  23       MS. CHANG:  Carolyn Chang for Redfin.

09:57  24       We have two simple discrete issues.

09:57  25       THE COURT:  You might pull the microphone up closer.

34

```
09:57   1        Thank you.  It's a problem when we have short people and
09:57   2   tall people.
09:57   3        MS. CHANG:  Yes.  I'm always reminded of being short.
09:57   4   Thank you, Your Honor.
09:57   5        THE COURT:  I didn't say you were short.
09:57   6        (Laughter.)
09:57   7        THE COURT:  There are short people like I am, and tall
09:57   8   people like some other counsel on your team.
09:57   9        MS. CHANG:  So...
09:57  10        THE COURT:  I probably put Mr. DiNovo in that group too.
09:57  11        MR. DiNOVO:  Thank you, Your Honor.
09:57  12        THE COURT:  And Mr. Adams.  So...
09:57  13        MS. CHANG:  Makes it even.  I feel so much better.  Thank
09:57  14   you.
09:57  15        All right.  So --
09:57  16        THE COURT:  Some of my favorite lawyers are the same
09:57  17   height I am.
09:57  18        MS. CHANG:  So there are two discrete issues we wanted to
09:57  19   address through our summary judgment motion.
09:57  20        The first is with respect to single-story properties.  I
09:57  21   have in front of you a slide that shows each of the asserted
09:57  22   claims have a limitation that Surefield's expert's only
09:57  23   infringement theory will point to a floor label, that these are
09:58  24   either one or two or allow a user to click on this label to
09:58  25   move between floors.
```

09:58  1          This label does not exist for single-story properties.  If

09:58  2   you take a look at what they allege over on the left, you can

09:58  3   see that's the floor label that shows you how many floors.  And

09:58  4   it'll have a number that indicates what floor you are on.

09:58  5          When you look at a single-story property, there is no

09:58  6   floor label.  It simply does not exist.

09:58  7          And I don't think there's any dispute about that.  The

09:58  8   picture on the right is from Surefield's briefing.  So at that

09:58  9   point you can see they don't have any evidence to show that the

09:58  10  feature that they accuse is in the single-story property model.

09:58  11         So we just want clarification that those are not

09:58  12  infringing uses of this technology.

09:58  13         If you go on, I think.  And you can skip over.

09:58  14         The second issue is related to the claim limitations.

09:59  15         Go all the way to the spatial boundaries.

09:59  16         So the other issue we wanted to get summary judgment on

09:59  17  relates to the asserted claims that have language in the claim

09:59  18  limitations.  And I've reproduced them here.  It's either "each

09:59  19  of the plurality of spatial boundaries defining a parcel

09:59  20  outline" and "corresponding to a parcel outline" or, again,

09:59  21  "spatial boundaries defining a parcel outline."

09:59  22         In the Court's claim construction order we have "parcel

09:59  23  outline" defined as the legal boundary of the land, so the

09:59  24  property lines.

09:59  25         So if we can go to the next one.

09:59  1        The only thing that's been identified in Surefield's

09:59  2    expert's infringement theories that has anything to do with

09:59  3    property lines is a map that is shown on a Redfin page that

09:59  4    will have the outline drawn.  Everyone agrees that that outline

10:00  5    is using data obtained from another third party not involved in

10:00  6    this litigation who specializes in getting county records about

10:00  7    what property lines are.  And that's put on this map.

10:00  8        There's nothing shown in any of the theories put forth by

10:00  9    Surefield's expert that puts any connection, any relationship

10:00 10    between what they allege is the spatial boundaries.  Now, the

10:00 11    spatial boundaries are the delineations of rooms or floors in

10:00 12    an actual 3D model.  So there's no relationship between the 3D

10:00 13    model and the only property lines that are pointed out to in

10:00 14    any of Surefield's theories.

10:00 15        So this is really starkly shown --

10:00 16        If we can go to the next slide.  Skip these.

10:00 17        On Slide 11 here, what you see is this is what a Redfin

10:00 18    page looks like.  And you can see a listing of a property.  And

10:00 19    usually if there is a 3D model associated with that, you can

10:00 20    click on a button that will give you a link to Matterport and

10:00 21    show you the model.

10:01 22        I picked here a listing that does not have a 3D model.  So

10:01 23    there are no spatial boundaries here, but you can still see the

10:01 24    property lines.

10:01 25        So this shows that there is no -- there cannot be any

10:01  1   relationship between the accused 3D models and the only

10:01  2   property lines that have been shown or alleged in this case.

10:01  3        So those are the two issues.  We think the claims that

10:01  4   have a spatial boundary defining or corresponding to a parcel

10:01  5   outline limitation.  Those cannot be infringed.

10:01  6        THE COURT:  Thank you, ma'am.

10:01  7        MR. DiNOVO:  Drew DiNovo again for plaintiff, Your Honor.

10:02  8        So of the two issues, let's take them in turn.  The

10:02  9   first -- and we didn't hear any response from Redfin's counsel

10:02  10  about this -- is they're missing the boat in terms of system

10:02  11  and CRM claims.

10:02  12       So with method claims, of course, the steps have to be

10:02  13  performed as claimed, either literally or under the Doctrine of

10:02  14  Equivalents.  With system claims, what the Federal Circuit has

10:02  15  told us is that apparatus claims cover what a device is, not

10:02  16  what a device does.

10:02  17       And so there's two key cases -- and even in the reply

10:02  18  brief they don't cite a single case about the capability of

10:02  19  system claims.  So there's the Core Wireless versus Apple

10:02  20  System Claim -- or excuse me -- System Case, and it was a

10:03  21  receiving -- it was a receiver for receiving information and

10:03  22  messages in a digital communications comprising.

10:03  23       And the Court basically held that -- well, let me just

10:03  24  actually read you the language -- that:  An accused infringer's

10:03  25  argument that its device operated in alternative modes misses

38

10:03  1   the mark.  Infringement is not avoided merely because of

10:03  2   noninfringing mode of operation is possible.

10:03  3       And they used an example, which I think is quite apt here,

10:03  4   where they talked about taking a simple example of an

10:03  5   automobile that's configured to operate in up to three gears.

10:03  6   And they said, even if it never hits the third gear, ever, it

10:03  7   still infringes every time because it has that capability.

10:03  8       And there's another case relating to the -- it's the --

10:04  9   excuse me -- the Finjan case relating to CRM claims, which it's

10:04  10  even stronger.  In that case, there was code that was present

10:04  11  in the accused product that was actually disabled.  And the

10:04  12  Federal Circuit said, we don't care if the code is disabled.

10:04  13  If it's present, there's infringement.

10:04  14      So there's no code here that's disabled.  The way that

10:04  15  their system works is a -- it's a soup-to-nut system where a

10:04  16  Redfin agent goes in or a Redfin photographer goes in, scans

10:04  17  the entire house, they then send this data to Matterport for

10:04  18  processing.  Matterport makes that available to Redfin on its

10:04  19  website or through its app, further processing is done and it's

10:04  20  presented to the user.

10:04  21      So if -- just doing a thought experiment, if someone

10:04  22  walked into -- if a Redfin agent walked into the house with

10:04  23  their scanning equipment and said -- and the person said, well,

10:05  24  you didn't scan the loft, they wouldn't have to go get a new

10:05  25  system.  The system is already capable of scanning two floors.

10:05   1      And there's no dispute in the record about that at all.

10:05   2   Dr. Melendez has testified repeatedly about the capability of

10:05   3   the system.  Their experts agree that the system is capable of

10:05   4   doing two floors.

10:05   5      So these system claims -- and I'll just list them for

10:05   6   you -- Claim 1 of the '885, Claim 10 of the '673, and the two

10:05   7   CRM claims of the '973, Claim 1 and Claim 18, also a

10:05   8   computer-readable method claim, those are infringed based on

10:05   9   capability.  And there's no case law or any significant

10:05   10   argument in the record from Redfin about that.

10:05   11      In terms of the method claims, we agree that these

10:05   12   labels -- there's one label shown in the '673 Claim 1 method.

10:05   13   And in the '111 Claim 18 there's explicitly two floors

10:06   14   required.  And so in order to practice that method claim, two

10:06   15   floors are required.  But the system claims that's not the law.

10:06   16      Now, to turn to their second argument, this requires a

10:06   17   little bit more detail.  But we'll just start with the '111

10:06   18   patent, Claim 18.

10:06   19      So they sort of jumble all of these claims together and

10:06   20   say that they're all the same, and that's simply not true.  So

10:06   21   here I believe it's visible to the Court, you see that there

10:06   22   are spatial boundaries disclosed, first and second spatial

10:06   23   boundaries.  And those are further delineations within a third

10:06   24   spatial boundary.

10:06   25      So the third spatial boundary is the parcel outline which

—40—

10:06  1   the Court has construed to mean the legal boundary of the land.

10:06  2   The evidence is undisputed that Redfin obtains the legal

10:06  3   boundary of the land.  It's not Matterport, it's Redfin that

10:06  4   goes out and gets it.  It puts it on its website.  That spatial

10:06  5   boundary defines a space in accordance with the Court's

10:07  6   construction.

10:07  7       The other two spatial boundaries, Dr. Melendez has

10:07  8   testified, can be either rooms or floors.  And their software,

10:07  9   it delineates or it's called "separates" rooms and floors.  And

10:07  10  so those spatial boundaries are within the third spatial

10:07  11  boundary, i.e., the legal property line, which of course can't

10:07  12  be generated or created by Redfin.  That's created by a

10:07  13  governmental entity.

10:07  14      Similarly, with the '973 Claim 1, which this is not an

10:07  15  asserted claim but a dependent claim, is asserted from it.  You

10:07  16  have at least one of the plurality of spatial boundaries

10:07  17  defining a parcel outline of the real property.  So, again,

10:07  18  that is the spatial boundary that they obtain from -- it's a

10:07  19  quasi-governmental entity and they put it on their website as

10:07  20  they've themselves shown.

10:07  21      And then there's other spatial boundaries which are

10:07  22  generated which are rooms and floors.  And, again, there's this

10:08  23  language that those are within the legal boundary of the land,

10:08  24  which is the case.

10:08  25      With respect to the '885 patent, what Dr. Melendez said is

41

10:08  1   because the -- and here it does use this rather more precise

10:08  2   language that the spatial boundary defines the legal boundary

10:08  3   of the land.

10:08  4       Because the legal entity is the one that defines it in

10:08  5   accordance with the Court's claim constructions, the way that

10:08  6   their system works is for each model that is generated there

10:08  7   are GPS coordinates -- and this is going to be relevant to

10:08  8   their orientation argument later.  But the -- each floor and

10:08  9   room has GPS boundaries associated with it.  And those GPS

10:08  10  boundaries are associated with and define the appropriate legal

10:08  11  boundary of the land.

10:08  12      So each of those asserted claims is different.  The

10:08  13  definitional language in Claim 1 of the '885 patent is not even

10:09  14  present.  In the '111 and '973 patent it's within.  And the

10:09  15  '673 patent, the second patent in time, there's no reference to

10:09  16  parcel outlines at all -- parcel boundaries.  Excuse me.

10:09  17      Thank you, Your Honor.

10:09  18      THE COURT:  Response?

10:09  19      MS. CHANG:  Carolyn Chang.

10:09  20      If I may just address the argument on the single-story

10:09  21  properties with respect to counsel's point about the

10:09  22  distinction between CRM and apparatus claims.

10:09  23      I think they pointed specifically to the core wireless

10:09  24  case and the Finjan case.

10:09  25      And those things are different.  Because in those cases

42

10:09   1   the defendant is saying, because I have a mode of operation

10:09   2   that's noninfringing or because the device that I sell and make

10:09   3   has -- is primarily used for noninfringing purposes, that the

10:10   4   device that is capable of doing what is required by the claims

10:10   5   cannot infringe.

10:10   6        We're not making that argument here.  What we're saying,

10:10   7   if you think about this case -- and Finjan makes this exact

10:10   8   point.  When we talk about this idea of a device being capable

10:10   9   of infringement, you have to look very specifically at the

10:10   10   exact claims in the case and the exact allegations in the

10:10   11   accused device in this case.

10:10   12        And what we're talking about is a system that Redfin

10:10   13   doesn't make and doesn't sell.  It is a user.  So when we're

10:10   14   talking about a CRM or a apparatus claim, we're talking about

10:10   15   Redfin's use.  Or their inducement of other people to use.

10:10   16        In that case we're very specifically talking about is this

10:10   17   thing capable of, when in use, putting a label on single-story

10:11   18   properties?  And I think what you hear here is there's going to

10:11   19   be no dispute that building the single-story properties is

10:11   20   noninfringing under their theory, because there are no floor

10:11   21   labels.

10:11   22        THE COURT:  There are no --

10:11   23        MS. CHANG:  There are no floor labels, and that's a

10:11   24   required element, according to their expert, for every

10:11   25   infringement theory.

| | | |
|---|---|---|
| 10:11 | 1 | So all we're asking for -- we're not asking for summary |
| 10:11 | 2 | judgment that there is no infringement across the board.  We |
| 10:11 | 3 | are asking for clarity that there is -- there cannot be |
| 10:11 | 4 | infringement in the use specifically for making single-story |
| 10:11 | 5 | models. |
| 10:11 | 6 | And that is relevant because there are some disputes that |
| 10:11 | 7 | will be related to our -- their damages Daubert motions related |
| 10:11 | 8 | to whether it was proper to have a damages calculation that |
| 10:11 | 9 | excludes single-story properties.  I think here there's going |
| 10:11 | 10 | to be no dispute that making single-story models is |
| 10:11 | 11 | noninfringing under their infringement theory. |
| 10:11 | 12 | So that's for the single-story property. |
| 10:12 | 13 | For the parcel outline, I do think it would be helpful -- |
| 10:12 | 14 | let me go... |
| 10:12 | 15 | (Off-the-record discussion.) |
| 10:12 | 16 | MS. CHANG:  Counsel was making some distinctions about the |
| 10:12 | 17 | different language in the claims, but I think the thing that's |
| 10:12 | 18 | important to take a look and I'll use the '111 patent here. |
| 10:12 | 19 | And this is the slide that counsel had shown, but I'm going to |
| 10:12 | 20 | point out that what it says is "defining a plurality of spatial |
| 10:13 | 21 | boundaries using the image data." |
| 10:13 | 22 | And there will be -- one of those plurality of spatial |
| 10:13 | 23 | boundaries is a third spatial boundary corresponding to a |
| 10:13 | 24 | parcel outline.  And you'll see that in each of the claims, |
| 10:13 | 25 | right? |

44

10:13  1        You have a plurality of spatial boundaries in the real

10:13  2   property, at least one of the plurality of spatial boundaries

10:13  3   defining a parcel outline.

10:13  4        I agree, there is -- this language doesn't exist in the

10:13  5   '673 patent.  This is only for the other three asserted

10:13  6   patents.  But for those three asserted patents, you have this

10:13  7   language that's talking about, in the model, you have to define

10:13  8   a plurality of spatial boundaries.  One of those spatial

10:13  9   boundaries has to define a parcel outline or has to correspond

10:13  10  to a parcel outline.

10:13  11       So there is no claim limitation here where you talk about

10:13  12  a parcel outline and the spatial boundaries are only within,

10:13  13  but there's always a requirement that one of the spatial

10:14  14  boundaries, one of the things that are part of the model, will

10:14  15  define the property lines.  And that's the evidence that's

10:14  16  completely missing.

10:14  17       Now, there was some discussion about orienting the models

10:14  18  that are built to GPS, and then counsel just concludes:  And

10:14  19  then that corresponds or that defines the parcel outline.

10:14  20       Again, I think what's missing, even if we accept that

10:14  21  there's this orientation and GPS -- because I don't want to

10:14  22  bring a dispute of fact into our summary judgment motion, I'll

10:14  23  accept that for the purposes of this motion -- the piece, the

10:14  24  key important piece that's missing is how does any of that

10:14  25  information define the one property line that they show, right,

10:14  1   that green line on the Google map that we show that has no

10:14  2   relationship to the model?

10:14  3       So regardless of what we talk about orientation and GPS,

10:14  4   that piece of evidence is just missing.

10:15  5       (Off-the-record bench conference.)

10:15  6       MR. DiNOVO:  Very briefly, Your Honor, to address the

10:15  7   first part about single-floor properties.  So counsel, I think,

10:15  8   said a couple of times that we're not going to dispute that

10:15  9   there's infringement for single-floor properties.  That's

10:15  10  incorrect.

10:15  11      The system is a system that they make and use.  That

10:15  12  system was -- they announced to the world that it was Redfin's

10:15  13  3D home tour, although we hear from counsel telling us that

10:15  14  it's Matterport's.  It was Redfin's 3D home tour announced in

10:15  15  2014, a year after our client filed their patent application.

10:15  16      That single unitary system is used for houses no matter

10:15  17  the floor.  So they're trying to get a 70 percent cut here in

10:15  18  infringement when the case law -- and they haven't cited a

10:15  19  single case that supports their position -- says otherwise.

10:15  20      Now, it may be relevant to the damages analysis in some

10:15  21  sense, but 70 percent of homes are single floor.  But from a

10:16  22  system utilization and CRM claim standpoint sense, it's --

10:16  23  there is infringement for the use of this system regardless of

10:16  24  whether it's a single floor or not.

10:16  25      Thank you.

46

10:16  1      MS. CHANG:  If I may, just one quick point on that.

10:16  2      To be clear, for the system claim and the CRM, there

10:16  3  exists no instructions.  Even when not in use, just a computer

10:16  4  sitting there, there are no instructions in that system to ever

10:16  5  put a floor label on a single-story building.  So...

10:16  6      (Off-the-record bench conference.)

10:18  7      THE COURT:  The Court is going to deny this motion.

10:18  8      The next motion up is Redfin's motion to strike the

10:18  9  Melendez report.

10:18  10      MR. DACUS:  Your Honor, as a matter of housekeeping, we're

10:18  11  going to take up another -- I know the Court has limited time

10:18  12  today.  I know you have something this afternoon, at least from

10:18  13  looking at the schedule.  So we're trying to be mindful of the

10:18  14  Court's time.

10:18  15      If you're going to take up another Redfin motion, can we

10:18  16  respectfully ask that you take up the motion to exclude the

10:18  17  plaintiff's damages expert?

10:18  18      THE COURT:  What is his name?

10:18  19      MR. DACUS:  Benoit.  It's Docket No. 99, Your Honor.

10:18  20      THE COURT:  Okay.  Give me one second.  Sure.

10:18  21      MR. DACUS:  Thank you.

10:18  22      Thank you, Your Honor.  Deron Dacus on behalf of Redfin on

10:19  23  a motion to exclude the plaintiff's damages expert, Mr. Benoit,

10:19  24  and his opinions.

10:19  25      I've said to the Court, and I think it's very important

47

10:19  1    for this particular motion, what the accused technology is.

10:19  2    It's this 3D virtual tour that is included within the broader

10:19  3    Redfin website for buying and selling real estate.

10:19  4        I'm sure the Court's bought and sold houses over time and

10:19  5    may actually been on a website to look for that at times.

10:19  6    So we're talking about the 3D virtual --

10:19  7        THE COURT:  You've got the wrong judge.

10:19  8        (Laughter.)

10:19  9        MR. DACUS:  And you've got the wrong lawyer too.

10:19  10       THE COURT:  No.  I've never done any of this.

10:19  11       MR. DACUS:  Then that lets me know, Your Honor -- I did

10:19  12   not want to bore the Court with some details if you had done

10:19  13   it.  So that lets me know what level of detail I need to

10:19  14   provide.

10:19  15       THE COURT:  I suspect that my wife has done it --

10:19  16       (Laughter.)

10:19  17       MR. DACUS:  I understand.

10:19  18       THE COURT:  -- a lot, but I have not.

10:19  19       MR. DACUS:  I understand.

10:19  20       So that -- that's the technology we're talking about, Your

10:19  21   Honor.

10:20  22       As the Court knows, being an expert in this damages area,

10:20  23   damages law is not always the model of clarity; but

10:20  24   fortunately, in this particular instance, the issues that we're

10:20  25   talking about in this motion to strike I think are well-settled

48

10:20  1   principles in the law.  And really, it's these three things

10:20  2   that form the basis of the motion to strike that I'll go into

10:20  3   detail on.

10:20  4      One is the hypothetical negotiation date and the fact that

10:20  5   you must -- the expert must use the correct date in his

10:20  6   analysis.  That's the first basis for striking in this case.

10:20  7      The second is the expert's failure to apportion, and I'll

10:20  8   get into the details.  And regrettably, it'll take me a little

10:20  9   bit of time to do that, as the Court can appreciate, but I will

10:20  10  say to the Court up front, having looked at a lot of these

10:20  11  cases over the years, I do think this may be the poster child

10:20  12  for lack of apportionment, and I want to spend some time on it

10:20  13  with the Court.

10:20  14     And then finally, there's a failure to use the proper

10:20  15  smallest salable practicing unit in this case.

10:21  16     And we believe Mr. Benoit has violated all three of those

10:21  17  principles, which I think are pretty well settled in the law at

10:21  18  this point.

10:21  19     Let me start with this hypothetical negotiation date.

10:21  20     So there are four patents at issue in the case, Your

10:21  21  Honor.  I know the Court knows this law very well, that the

10:21  22  hypothetical negotiation date must correspond to the first date

10:21  23  of infringement.  I know the Court knows this law well because

10:21  24  I've been at both of these tables at one time or another

10:21  25  arguing these and I've been the recipient of the Court telling

10:21   1   me that my expert did not use the proper hypothetical

10:21   2   negotiation date.

10:21   3        And my understanding from what I've heard the Court say in

10:21   4   hearings and from reviewing opinions is, for each patent and/or

10:21   5   each product there must be a separate analysis of the

10:21   6   hypothetical negotiation date, and that's where Mr. Benoit goes

10:21   7   awry here.

10:21   8        As I said, there are four patents at issue.  The first of

10:21   9   the patents issued in December of 2017, and that is the only

10:22   10  and sole hypothetical negotiation date that the plaintiff's

10:22   11  expert used.

10:22   12       The three other patents were issued in 2018, '19 and '20.

10:22   13  And Mr. Benoit, the plaintiff's expert, did no analysis of the

10:22   14  Georgia-Pacific factors nor of the bargaining positions at all

10:22   15  with respect to those later dates.

10:22   16       And of course that's required.  I mean, you -- the law

10:22   17  says you need to do a separate analysis because circumstances

10:22   18  may change in later dates.  And we don't need to debate whether

10:22   19  or not they did in this case.  They did actually change

10:22   20  significantly in this case.  Plaintiff Surefield's business

10:22   21  deteriorated rapidly, and so circumstances did change.

10:22   22       That's not what we're arguing here.  The fact is the

10:22   23  expert needed to do the analysis and he didn't.

10:22   24       The only thing, if you look in the plaintiff's response to

10:23   25  our motion to strike related to this hypothetical negotiation

10:23  1   date, they literally point to one single piece of evidence in

10:23  2   their report, and that piece of evidence is their damages

10:23  3   expert saying that the technical benefits, and I want to

10:23  4   emphasize those two words, the "technical benefits" of all four

10:23  5   of these patents are the same.

10:23  6         Well, that's a fact and that's interesting, but it's not

10:23  7   the question here.  The question here is:  Did the damages

10:23  8   expert analyze the bargaining positions of the parties in those

10:23  9   later dates?

10:23  10        He did not.  There's nothing in his report, and they cite

10:23  11  nothing in their response to show that he did.  Simply saying

10:23  12  that the patents had the same technical benefits is an

10:23  13  interesting fact, but one that's irrelevant to this question.

10:23  14        So from our perspective the damages opinions related to

10:23  15  the later three patents, and I'll read those into the record.

10:23  16  That's the '673, '111 and '973 patents should be stricken.

10:24  17        So with that, Your Honor, I can either turn to the second

10:24  18  basis related to apportionment, or I can allow the plaintiff to

10:24  19  address this hypothetical negotiation date issue, whatever the

10:24  20  Court pleases.

10:24  21        THE COURT:  I would prefer that, please, that I hear a

10:24  22  response.

10:24  23        MR. DACUS:  A response.  Okay.  I'll be happy to do that,

10:24  24  Your Honor.  Thank you.

10:24  25        MS. GLAUSER:  Good morning, Your Honor.

| | | |
|---|---|---|
| 10:24 | 1 | In fact, the testimony that the technical benefits of the |
| 10:24 | 2 | four patents are substantially the same is not irrelevant.  It |
| 10:24 | 3 | forms the basis of our damage expert's opinion, that the damage |
| 10:24 | 4 | award would be the same whether or not just the first patent, |
| 10:24 | 5 | meaning the '885 patent, was infringed.  Or instead whether or |
| 10:25 | 6 | not all four patents were infringed. |
| 10:25 | 7 | And it's based on that expressly disclosed opinion that |
| 10:25 | 8 | Mr. Benoit relied on a hypothetical negotiation date of |
| 10:25 | 9 | December 5, 2017 which is the date of the first infringement of |
| 10:25 | 10 | the '885 patent. |
| 10:25 | 11 | And the case law is clear in cases such as Prism, which |
| 10:25 | 12 | we've cited in our brief, that the technical expert under such |
| 10:25 | 13 | circumstances isn't required to offer contingent theories of if |
| 10:25 | 14 | only one patent is -- if all four are infringed or if just |
| 10:25 | 15 | three of the four are infringed. |
| 10:25 | 16 | In this case so long as the '885 patent was infringed, |
| 10:25 | 17 | then the damage award did not increase with the subsequent |
| 10:25 | 18 | infringement that occurred upon the issuance of the three later |
| 10:25 | 19 | patents.  And as a result, Mr. Benoit was correct or his |
| 10:25 | 20 | methodology was sound, in relying on the December 5, 2017 date |
| 10:26 | 21 | as his hypothetical negotiation date. |
| 10:26 | 22 | MR. DACUS:  So I do appreciate the plaintiff admitting |
| 10:26 | 23 | that the only thing they've concluded is that the technical |
| 10:26 | 24 | benefits of the four patents are the same.  But, of course, |
| 10:26 | 25 | that's the issue, Your Honor. |

10:26   1          Even if the technical benefits are the same, there are

10:26   2    many Georgia-Pacific factors.  The expert is required to look

10:26   3    at the bargaining positions of the parties.  Even for four

10:26   4    patents that have the same technical benefits, the royalty

10:26   5    could come out very different based on the differing bargaining

10:26   6    positions of the parties and the other Georgia-Pacific factors

10:26   7    that he must analyze at all those varying dates.

10:26   8          And that's really, by plaintiff's own admission at this

10:26   9    point, what they failed to do.  And the remedy for that is to

10:27  10    exclude the opinions related to the later three patents.

10:27  11          That's what I have on that, Your Honor.

10:27  12          (Pause in proceedings.)

10:28  13          THE COURT:  Counsel, here's what I'm going to do:  I'm

10:28  14    going to deny the motion at this time.  This is a motion that I

10:28  15    think might be revisited if the jury were to invalidate the

10:28  16    first -- the earlier patent that the hypothetical negotiation

10:28  17    was based on.

10:28  18          And I think there might be serious questions about whether

10:28  19    or not -- I think that says it all.  I think it --

10:28  20          MR. DACUS:  Understood.

10:28  21          THE COURT.  You understand that if the first -- I think if

10:28  22    the first patent is not invalidated and is infringed, then I'm

10:29  23    not going to have a problem.  But if the first one is

10:29  24    invalidated, we'll have to revisit this issue.

10:29  25          MR. DACUS:  Understood, Your Honor.  Thank you very much.

10:29  1          I'll turn to the apportionment issue with the Court's

10:29  2    permission, Your Honor.

10:29  3          THE COURT:  Yes, please.

10:29  4          MR. DACUS:  That's the second basis for excluding the

10:29  5    plaintiff Benoit's testimony.  And this applies to all four

10:29  6    patents, I've already said to the Court.

10:29  7          But just to reorient you, we're talking about a 3D virtual

10:29  8    tour in a much larger business that Redfin undertakes of buying

10:29  9    and selling homes.

10:29  10         And not only does Redfin act as sort of the equivalent of

10:29  11   a real estate agent in the buying and selling homes, Your

10:29  12   Honor, it's also important to note that Redfin also actually

10:29  13   buys and sells homes, as at least a part of their business.  In

10:29  14   other words, at times they'll -- they will actually go purchase

10:29  15   a home, put it on their website and then resell it.

10:29  16         I say that because it's important to note that ultimately

10:29  17   what Mr. Benoit does is take the revenues and profits from the

10:30  18   entirety of Redfin's business, that's both gathering

10:30  19   commissions from the agent side and the buying of selling

10:30  20   homes, and use that as a basis for his calculation.

10:30  21         Now, when we're talking about -- the only accused

10:30  22   technology on the Redfin website is the 3D virtual tour, that

10:30  23   scenario in his use of the total revenues and profits, I think,

10:30  24   screams for apportionment.  And that's basically an outline of

10:30  25   the situation that we find ourselves in.

10:30  1          The only other fact that I want to talk about before we

10:30  2   dig into the law is, 3D virtual tours, by everyone's admission,

10:30  3   including the plaintiff, existed before the plaintiff.

10:30  4          To the extent the plaintiff has an invention here, it's an

10:30  5   incremental invention on a 3D virtual tour that existed long

10:30  6   before the Surefield patents that we're here about.

10:30  7          As the Court well knows -- and again, I've been on both

10:31  8   sides of this issue with the Court and heard the Court say what

10:31  9   it believes the law is, and I agree.  In order to get to the

10:31  10  appropriate amount of royalty here, the plaintiff is required

10:31  11  to apportion its reasonable royalty as it relates to this 3D

10:31  12  virtual tour.

10:31  13         And to be more specific, what the plaintiff needs to do

10:31  14  is, the plaintiff needs to determine what the non-patented

10:31  15  features are in that 3D virtual tour, the plaintiff needs to

10:31  16  determine what the previously existing prior art was because

10:31  17  that's not part of the incremental advance that the plaintiff

10:31  18  made, and they also need to look to determine if there are

10:31  19  other patents that relate to the 3D virtual tour and, indeed,

10:31  20  Matterport, who's the creator here, actually has multiple

10:31  21  patents.

10:31  22         So that's the damages expert's job, to figure out what's

10:32  23  the incremental advance here.  I know I'm repeating what the

10:32  24  Court knows, but Mr. Benoit, almost without remorse, did none

10:32  25  of that in this case.  He didn't even attempt to do so.

10:32  1      And I'm very reluctant and somewhat loathe to do this, but

10:32  2  I think the best way to demonstrate, rather than just have me

10:32  3  tell you that he did not do it, is to really look at his

10:32  4  deposition testimony.

10:32  5      I mean, we took his deposition, as the Court might expect,

10:32  6  on this matter of apportionment.  If we look -- I'm showing

10:32  7  Page 39 from Mr. Benoit's deposition, and I asked him at the

10:32  8  bottom on Line 24:  Did you make any attempt or analysis in

10:32  9  this case to identify the features or functions of the

10:32  10  Matterport 3D tour technology that were not covered by the

10:33  11  patents?

10:33  12      And of course that's the applicable question or at least

10:33  13  one of the applicable questions for apportionment, right?  What

10:33  14  did you do to properly value only the patented technology?

10:33  15      And the Court can see, and I'm a little bit loathe to read

10:33  16  it all, but he completely failed to answer the question.  I

10:33  17  mean, it's a very direct question.  It's a question that any

10:33  18  damages expert should be able to answer very quickly because

10:33  19  it's an absolute requirement.  And it's clear that what he did

10:33  20  is just value the entirety of the 3D technology.

10:33  21      And then on Line 14, I tried, as we do with these damages

10:33  22  experts, and I know the Court has experienced this in practice,

10:33  23  they're not always forthcoming with their opinions or direct

10:33  24  answers.  So I asked him again:  Did you attempt to analyze or

10:33  25  identify any features or functions within the Matterport 3D

56

10:33 1  tour technology that were not covered by the patents-in-suit?

10:33 2      And of course that's the question.

10:34 3      What he says is:  What I'm saying is that I have

10:34 4  considered all the evidence, the importance of the features as

10:34 5  articulated by the defendants indicating that the importance is

10:34 6  providing the user experience of being able to go in and out of

10:34 7  a home to have the feeling of being in that photorealistic

10:34 8  environment, to take measurements of the space to see if it

10:34 9  fits their needs.

10:34 10     But the most important part is the part that I have

10:34 11 bracketed, he says:  My value is derived or is articulated

10:34 12 relative to the benefits that I'm saying are enjoyed by use of

10:34 13 3D-walkthrough capability.

10:34 14     So he admits he's measuring the entirety.  And I could

10:34 15 give you five or six cites from his deposition where he admits,

10:34 16 Your Honor, that what he measured was the entirety of this 3D

10:34 17 virtual tour without any apportionment.  Five or six cites from

10:34 18 the deposition that say the same thing.

10:35 19     I think the important part for the Court, at least from my

10:35 20 perspective here, is this:  I've heard the Court say, and I

10:35 21 certainly believe this is a proper recitation of the law, that

10:35 22 in order for the damages expert to properly apportion, the

10:35 23 technical expert has to do the job of apportionment.

10:35 24     The technical expert needs to be the one who looks at the

10:35 25 3D virtual tour in this instance and says, hey, this part of

10:35  1    the 3D virtual tour existed in the prior art.  This part is

10:35  2    non-patented.  This part is patented by Matterport.  And here

10:35  3    I've identified the inventive aspect of the patents-in-suit.

10:35  4         And in this case you will find no evidence that the

10:35  5    technical expert did that in this case.  Mr. Benoit, in his

10:35  6    deposition, admits as much.  And this'll be the last time I

10:36  7    show a deposition excerpt, but I believe this is important.  I

10:36  8    know the details matter on these.  These are not easy

10:36  9    decisions, Your Honor.

10:36  10        So, again, I asked him in his deposition, "Are you aware

10:36  11   of or did you ask Dr. Melendez" -- that's the plaintiff's

10:36  12   technical expert -- "to identify for you the features, all of

10:36  13   the features of the Matterport 3D tour technology that are not

10:36  14   covered by the patents-in-suit?"

10:36  15        And of course that's the -- that's the question he should

10:36  16   be able to easily answer if he's doing apportionment.  And he

10:36  17   said, "So as I have articulated several times, the focus of my

10:36  18   analysis has to be on what is the value that the defendants are

10:36  19   going to derive from use of the technology.  What are the costs

10:36  20   they're going to incur to enjoy the benefit?  The benefit is

10:36  21   the ones that I've articulated.  I won't say it again."

10:36  22        Of course he was a little annoyed because I was asking him

10:36  23   the same question over an over without an answer.  And he

10:37  24   identifies nothing that he relied on with respect to

10:37  25   Dr. Melendez.

10:37 1      And so when he refers to the technology in his answer, we

10:37 2 know exactly what he's referring to.  He's told us.  He's

10:37 3 referring to the entirety of the 3D virtual tour walkthrough

10:37 4 capability.

10:37 5      That's exactly what he's not supposed to do.  He's

10:37 6 supposed to apportion down to the inventive aspect of the

10:37 7 patent.

10:37 8      And in the end I think all of this is difficult work for

10:37 9 the Court.  But in the end there's absolutely no expert

10:37 10 testimony, no technical expert testimony by which the technical

10:37 11 expert did this apportionment, and then the damages expert

10:37 12 relied on it.

10:37 13      And then at the end of the day, because there's no

10:37 14 apportionment, Your Honor, we believe that Mr. Benoit's

10:37 15 opinions should be stricken.

10:37 16      And that's all I have, Your Honor, unless you have any

10:37 17 questions.  Thank you.

10:37 18      MS. GLAUSER:  In his analysis Mr. Benoit conducted two

10:38 19 apportionments.  First, he started by looking at the revenue

10:38 20 and incremental profit that was attributable to the patented

10:38 21 inventions, and we'll discuss that a bit more when we deal with

10:38 22 defendant's entire market value rule arguments.  But that was

10:38 23 the first step of his apportionment.

10:38 24      After doing that, to break it down to only the value

10:38 25 attributable to the patents and the patented features,

| 10:38 | 1 | Mr. Benoit did conduct a second apportionment to further |

10:38   1   Mr. Benoit did conduct a second apportionment to further

10:38   2   apportion his damage award to account for only the inventive

10:38   3   features of the patent or, said another way, to exclude the

10:38   4   non-inventive or conventional features.

10:39   5       And he did that by relying on Mr. -- I'm sorry --

10:39   6   Dr. Melendez' analysis of the inventive components.  And if --

10:39   7   I don't know if you'd like me to show it, but in Mr. Benoit's

10:39   8   report, Paragraphs 27, 28 and 29 at least, are a recitation of

10:39   9   what Mr. Benoit learned from the technical expert,

10:39   10  Dr. Melendez.  And it's an identification of the features

10:39   11  within this accused 3D tour that are inventive, in other words,

10:39   12  that are nonconventional.

10:39   13      And as a result, Mr. Benoit walks through what the

10:39   14  technical expert has identified as inventive elements, and he

10:39   15  then goes through his analysis to value then what the use is

10:39   16  from those nonconventional elements.

10:39   17      Now, in the end, what Mr. Benoit does is he apportions the

10:40   18  $2.4 million that Redfin paid to Matterport for use of its 3D

10:40   19  tour software or the scans, and that's the exact same

10:40   20  apportionment that Redfin's own damage expert did.

10:40   21      So Mr. Malackowski is Redfin's damage expert.  And in his

10:40   22  report he says that the value of the inventive components

10:40   23  versus the conventional components is based on the fee that

10:40   24  Redfin paid to Matterport.

10:40   25      Now, Mr. Malackowski, Redfin's expert, determined that

10:40  1    only 50 percent of that $19 fee, so $9.50, should be allocated

10:40  2    to inventive and then the other 50 percent should be allocated

10:40  3    to conventional components.

10:40  4        What Mr. Benoit did instead was he took the 100 percent,

10:40  5    the entirety of that fee, and allocated it to account for

10:40  6    conventional components, and he takes that out of his damage

10:41  7    award in full.

10:41  8        Now, in their briefing Redfin has identified at most two

10:41  9    elements that it contends -- or features that it contends

10:41  10   constitute conventional features for which Mr. Benoit failed to

10:41  11   do an apportionment.

10:41  12       The first is what's called a "dollhouse view," which is

10:41  13   the ability when you're on Redfin.com's website to kind of scan

10:41  14   out and do a bird's eye view from the top.  It almost looks

10:41  15   like a dollhouse, hence the name.

10:41  16       The second is a feature on the Redfin website where you

10:41  17   can measure the distance to between two points using, you know,

10:41  18   a ruler, an electronic ruler, between those two points within

10:41  19   the house.  And Mr. Benoit discusses both of those features in

10:41  20   his report.

10:41  21       With regard to the dollhouse, he recites that he learned

10:42  22   from Dr. Melendez, our technical expert, that the value of the

10:42  23   dollhouse feature is imparted from the patents because the

10:42  24   patents claim an inventive component that is functionally

10:42  25   linking the 3D model and the dollhouse view.

61

10:42  1        So while dollhouse views existed before Surefield's

10:42  2   patents, what didn't exist was the ability to move between a

10:42  3   spot in the 3D model and a spot within the dollhouse view.

10:42  4        And Mr. Benoit concludes, based on evidence from Redfin

10:42  5   and Matterport itself, that that is the value attributable to

10:42  6   the dollhouse for which he has determined the incremental

10:42  7   profit from use of the patent.

10:42  8        Likewise, with regard to the ruler, Mr. Benoit

10:42  9   acknowledges that the ruler is not a feature that is claimed

10:42  10  within Surefield's patents.  However, the functionality of the

10:43  11  ruler is enabled by Surefield's patents.

10:43  12       It's not until you have the particular type of 3D model

10:43  13  that was invented in the patents that you're able to have the

10:43  14  precise depth and visual photorealistic views that would allow

10:43  15  you to, for instance, within the 3D model, measure from the

10:43  16  start of one wall to the end of another wall -- the start of

10:43  17  the wall to the end of the wall to determine whether or not a

10:43  18  sofa fit.

10:43  19       In all of the conventional or prior art 3D models, the

10:43  20  views were distorted or the depth data wasn't sufficient to

10:43  21  enable the functionality of the ruler in any meaningful way.

10:43  22  So what we're left with at the end of the day is really

10:43  23  Redfin's critiques about the way in which Mr. Benoit

10:43  24  apportioned, not whether or not he apportioned.

10:43  25       THE COURT:  Mr. Dacus?

10:44    1          MR. DACUS:  Thank you, Your Honor.

10:44    2          So I think what we're left here with, Your Honor, are

10:44    3   lawyers who know the law at the plaintiff's table and have

10:44    4   articulated things that they certainly want their expert

10:44    5   reports to say, but in no way do they.

10:44    6          At no point did anyone show you an opinion from the

10:44    7   technical expert apportioning, as the technical expert must,

10:44    8   between the alleged inventive concept of these patents and all

10:44    9   those things that they need to apportion out:  Other people's

10:44   10   patents, non-patented technology.  No one showed you that

10:44   11   information.  That's the information that's required.

10:44   12          Nor did they show you the damage expert relying on that

10:44   13   technical expert's apportionment opinion.  Nor could he,

10:44   14   because it doesn't exist.

10:44   15          And I think at the end of the day that's what's missing.

10:45   16   We just don't have apportionment here.  And the proof is sort

10:45   17   of in the pudding.  Not sort of.  The proof is in the pudding.

10:45   18          We have a damages expert on the plaintiff's side.  And as

10:45   19   counsel said, the total amount that was paid -- to give the

10:45   20   Court some sort of perspective of the magnitude of what we view

10:45   21   as being egregious here -- Redfin actually pays for this

10:45   22   technology that's accused.  They paid $2.4 million over the

10:45   23   course of four years for it.

10:45   24          The damages claim in this case, once they supplement, is

10:45   25   likely to reach $100 million.  So we're talking about a damages

63

10:45   1    claim that is some 50 times what's actually paid for the

10:45   2    accused technology.

10:45   3        And what Mr. Benoit, the plaintiff's expert, did is, he's

10:45   4    taking -- literally taking the revenues from sales of homes and

10:45   5    using that as a base to calculate his damages here.  I think

10:46   6    that provides context at a large view to what the issues are

10:46   7    here.

10:46   8        And when you dig into the details, the fact is we just

10:46   9    don't have any technical expert opinions or, truthfully, damage

10:46   10   expert opinions walking us through the apportionment analysis.

10:46   11       And that's all I have, unless the Court has questions,

10:46   12   Your Honor.

10:46   13       MS. GLAUSER:  Your Honor, if I may briefly respond.

10:46   14       Here's where I may need some help, but -- put it on there.

10:46   15       So I was faulted for not showing the Court places in

10:46   16   Mr. Benoit's report where, in fact, he relies on an

10:46   17   apportionment, an identification of the inventive features of

10:46   18   the patents.

10:46   19       But if you look at Paragraph 29 here, this is -- I cited

10:46   20   Paragraphs 27 and forward, but if you look at the bottom of

10:46   21   Paragraph 29 here, this is where he explicitly recites that

10:47   22   viewers are able to take meaningful measurements as a result of

10:47   23   the patented inventions using -- when using the 3D tour.  And

10:47   24   he's citing there, in that footnote, to discussions with

10:47   25   Dr. Melendez.

64

10:47   1        As a further example with regard to the dollhouse view,

10:47   2   which is the second feature that Redfin contends is a

10:47   3   conventional feature, Mr. Benoit explicitly states that as a

10:47   4   result of the patented inventions, dollhouse views can be

10:47   5   generated that are operationally linked to the model and

10:47   6   panoramic views such that a user can move from an outside

10:47   7   overhead view to an inside photorealistic view.

10:47   8        And again, he then cites a discussion with Dr. Melendez.

10:47   9        And so as a result, all we're left with here is a dispute

10:47   10  between Surefield and Redfin regarding what is the inventive

10:47   11  component or components, not an issue with Mr. Benoit's

10:47   12  methodology.

10:47   13       He clearly relied on the technical expert's identification

10:48   14  of the inventive features and he definitively deducted an

10:48   15  amount to account for anything that did not fall within those

10:48   16  inventive features and, in fact, deducted the entire amount

10:48   17  rather than the 50 percent amount that Redfin's own expert

10:48   18  allocated to an apportionment between inventive and

10:48   19  conventional features.

10:48   20       MR. DACUS:  So just to address that point, Your Honor, and

10:48   21  I think actually this illustrates the point very well.  What

10:48   22  the -- what counsel just told you is that this measurement

10:48   23  feature was included in Mr. Benoit's calculation.

10:48   24       Yet Mr. Benoit -- this is an excerpt from his deposition.

10:48   25  If we start at Line 19, I asked him, "So one thing you said in

10:48   1   your answer is there may be minor elements that are not" -- and

10:49   2   I put a square around that -- "covered by the patents-in-suit.

10:49   3   Did you make any attempt to identify what those are?"

10:49   4        And he said, "Again, I think one that we just talked about

10:49   5   is the potential to have maybe a ruler that shows up as a click

10:49   6   feature that enables you to take a measurement."

10:49   7        So Mr. Benoit in his deposition expressly and completely

10:49   8   says that taking a measurement is not covered by the patent.

10:49   9   And yet he included it in part of his overall calculation.  And

10:49  10   the lawyers have admitted to you that he included it in his

10:49  11   calculation, when he says expressly it's not part of the

10:49  12   covered patents.  That's exactly the reason we have

10:49  13   apportionment, Your Honor.

10:49  14        So that's all I have unless the Court has questions.

10:49  15   Thank you, Your Honor.

10:49  16        (Off-the-record bench conference.)

10:50  17        THE COURT:  Mr. Dacus, if you could go ahead and do the

10:50  18   entire market value part of your argument as well.  And I'll

10:51  19   take these two in context.

10:51  20        MR. DACUS:  I think I've -- I won't belabor this point,

10:51  21   Your Honor.  And I think I've touched on the facts that are

10:51  22   relevant to it, and that's why I won't belabor it.

10:51  23        THE COURT:  Okay.

10:51  24        MR. DACUS:  But just to highlight to make sure I'm at

10:51  25   least as clear as I possibly can be.  I mean, what Mr. Benoit

10:51 1  did is he took the revenues and profits.  Those revenues and

10:51 2  profits here are constituted of the commissions that Redfin has

10:51 3  paid when a home is bought and sold.

10:51 4      In addition, Mr. Benoit, the plaintiff's expert, took the

10:51 5  revenues from the actual selling of homes, homes that Redfin

10:51 6  bought.  He took that and calculated the profits thereby,

10:51 7  rather than isolating on what should be the smallest salable

10:51 8  practicing unit which is the 3D virtual tour.

10:51 9      So the way I see it -- and I don't profess that it's

10:52 10 correct but I think it is, the way the analysis goes here is

10:52 11 the plaintiff's expert should look for the smallest salable

10:52 12 practicing unit.  That's the 3D virtual tour.  Rather than

10:52 13 isolating that, he focused on the revenues and the profits from

10:52 14 the entirety of the business.

10:52 15     THE COURT:  But isn't the plaintiff's -- and I'm saying

10:52 16 it's the right methodology, but isn't he essentially saying I

10:52 17 want a percentage of the additional benefit Redfin gets from

10:52 18 the sales of these houses?  And that's going to be a -- that's

10:52 19 going to be driven by the price of the house?  Maybe I just

10:52 20 don't understand how that works.

10:52 21     MR. DACUS:  No.  That's right.  But where he failed, I

10:52 22 think most egregiously, is he took the entirety of that price

10:52 23 increase which he attributes to the 3D virtual tour, and he did

10:52 24 not apportion the 3D virtual tour.  A tour that everyone here

10:53 25 admits, 3D virtual tour --

67

10:53   1          THE COURT:  I got it.  So --

10:53   2          MR. DACUS:  He didn't apportion at that point.

10:53   3          THE COURT:  Got it.

10:53   4          MR. DACUS:  So I don't -- I take a little exception with

10:53   5     the Court saying it's okay to take the total price --

10:53   6          THE COURT:  I didn't say it was okay.  I'm just saying --

10:53   7     I'm just trying to make sure I understand the methodology.

10:53   8          MR. DACUS:  Understood.

10:53   9          THE COURT:  And so because you're saying he used the

10:53   10    wrong -- he should use the 3D --

10:53   11         MR. DACUS:  The virtual tour.

10:53   12         THE COURT:  -- and they used -- I'm just saying, I

10:53   13    understand why they did that.  I'm not saying it's right or

10:53   14    wrong, but --

10:53   15         MR. DACUS:  They did it, just so we're clear, because when

10:53   16    you take the revenues from sales of homes, you get to very

10:53   17    large numbers very quickly.

10:53   18         But I will readily admit, I think there was a way for them

10:53   19    to do that that would have been proper.  I don't think they did

10:53   20    here.

10:53   21         But to me the most glaring, egregious violation here is of

10:53   22    apportionment, because it is undisputed that what Mr. Benoit

10:53   23    did is he said the 3D virtual tour increased the price of this

10:54   24    home, regardless of whether there's merits to it, by X

10:54   25    percentage.

68

10:54  1        Well, even if that's true, then you need to apportion for

10:54  2   the inventive aspect of that 3D virtual tour that comes from

10:54  3   these patents and that's where they totally failed, and that's

10:54  4   where they needed, candidly, Mr. Melendez' technical expertise

10:54  5   to help them.

10:54  6        THE COURT:  I had a case where it had to do with an

10:54  7   allegedly infringing -- the hubs you put up in different --

10:54  8   like a Starbucks or whatever, and they wanted to use the value

10:54  9   of the Starbucks.  In fact, when I cross-examined their expert,

10:54  10  I said, well, if this were on a plane, it would be the value of

10:54  11  the plane?

10:54  12       And he said, yeah.  You would take a percentage of the

10:54  13  plane, which would be a pretty good number, actually.

10:54  14       MR. DACUS:  Yes.  And we have similar numbers here, maybe

10:54  15  not quite as costly as a plane, but rapidly approaching.

10:54  16       Thank you, Your Honor.

10:54  17       THE COURT:  If I could have a response.

10:55  18       MS. GLAUSER:  I think it's important as a starting point

10:55  19  to kind of anchor what it is that Mr. Benoit did.

10:55  20       And so while he did start by looking at Redfin's revenue

10:55  21  from listings with 3D tours, he didn't stop there.  Instead,

10:55  22  his very next step was to apportion down to the incremental

10:55  23  profit that Redfin owns as a result of the patent.

10:55  24       And he relied on Matterport and Redfin's own statements

10:55  25  and own studies about what that incremental profit was.  And so

10:55  1    it's Matterport and Redfin who have claimed that use of 3D

10:55  2    increases, for example, the sales price of the house.

10:55  3        And so Mr. Benoit started with Redfin's 3D listing revenue

10:55  4    and then apportioned down to three incremental profit benefits

10:56  5    that Redfin realizes.  The first is this price premium on 3D

10:56  6    listing.

10:56  7        The second is increased listing conversions, meaning that

10:56  8    based on Redfin and Matterport's own documents, the evidence

10:56  9    indicates that Redfin owns listings -- meaning it becomes the

10:56  10   agent -- on more properties as a result of its use of 3D tours.

10:56  11       And then the third was a cost savings that Redfin enjoys

10:56  12   as a result of its use of 3D tours.  Because based on evidence

10:56  13   that Matterport and Redfin have published, use of 3D tours in a

10:56  14   listing reduces the days on market for that listing.  And

10:56  15   associated with each day are increased costs of in-person

10:56  16   tours.  And so a reduction of days on the market due to 3D

10:56  17   tours being included with the listing equates to a reduction in

10:56  18   the cost of in-person tours.

10:56  19       And it's based on that that Mr. Benoit concluded that of

10:57  20   Redfin's 3D listing revenue, Redfin generated about 110, 111

10:57  21   additional million dollars from use of the patent.  So that is

10:57  22   an apportionment down to that smallest salable patent

10:57  23   practicing unit of the 3D tour.

10:57  24       And it's okay that Mr. Benoit started with Redfin's entire

10:57  25   3D listing revenue.  There's nothing wrong with doing so.  And,

10:57 1    in fact, numerous cases have sanctioned the idea that starting

10:57 2    there is okay, as long as you ultimately apportion down to,

10:57 3    one, the patented features, which he did by identifying the

10:57 4    incremental profit associated just with the patent.  So just

10:57 5    with the 3D tours.

10:57 6        And it's important to note here that our technical expert,

10:57 7    Dr. Melendez, concluded that the patents cover the entirety of

10:58 8    the 3D tour itself.

10:58 9        So as a result, this case is analogous to Exmark where the

10:58 10   patent covered the entire lawn mower.  And as a result you

10:58 11   could look to the additional revenue or profit that the

10:58 12   defendant earns from sales of the lawn mower.

10:58 13       Now, of course the case law continues and says that a

10:58 14   second apportionment needs to be done to account not just for

10:58 15   the patented features but for the inventive elements of the

10:58 16   patent.  And that's the apportionment that we previously

10:58 17   described Mr. Benoit conducted.

10:58 18       There are numerous cases in which the Court has sanctioned

10:58 19   the idea of using this income approach, using an analysis of

10:58 20   the Georgia-Pacific factors to start with the total revenue and

10:58 21   then apportion down to the patented features and the inventive

10:58 22   components.  And Mr. Benoit's calculation of that comports with

10:59 23   those cases.

10:59 24       In fact, in the -- I don't know how to say it -- but it's

10:59 25   MiiC case which we've cited in our brief as 2017 Westlaw

10:59  1   6268072, the Court specifically concluded that by calculating

10:59  2   cost savings, benefits from the patent that the expert had

10:59  3   apportioned between patented and unpatented features.

10:59  4        And that's what Mr. Benoit did here.  He not only

10:59  5   calculated cost savings but also just incremental profit due to

10:59  6   the 3D tour.  And as a result, Mr. Benoit conducted the

10:59  7   apportionment between the patented features and the

10:59  8   non-patented features.

10:59  9        Now, I think what Redfin's true complaint is is that while

10:59  10  Mr. Benoit's damage award calculations, so his $48.7 million

10:59  11  calculation, properly apportions down to the necessary

11:00  12  inventive footprint of the patent, they complain that he then

11:00  13  expresses that award in terms of a percent of the total

11:00  14  revenue.

11:00  15       And we didn't, in fact, do that to skew the damage award.

11:00  16  It wasn't chosen in order to present the jury with an overly

11:00  17  large number.  It was done properly with approval from the case

11:00  18  law because, one, Redfin and Matterport have claimed that their

11:00  19  overall revenue is impacted; two, there is no additional

11:00  20  revenue data.

11:00  21       The 3D models are not separately sold by Redfin, and so

11:00  22  the only revenue data that existed was from sales of listings

11:00  23  with the 3D tour.

11:00  24       And under such circumstances, again, the law sanctions

11:00  25  Mr. Benoit starting with the revenue so long as his ultimate

11:00  1  award is limited to the inventive footprint, as it is here.

11:00  2      And in -- just in case I don't have an opportunity to get

11:00  3  back up, to the extent that Redfin's real worry is about an

11:01  4  evidentiary principle or the concern that presenting the jury

11:01  5  with a running royalty expressed as a percentage of total

11:01  6  revenue, Mr. Benoit's damage award, which is properly

11:01  7  apportioned, could be stated or re-expressed as a dollar-per-3D

11:01  8  listing running royalty.  And that's the same base that Redfin

11:01  9  has used, and it could be a change that doesn't affect

11:01  10  Mr. Benoit's methodology.  It doesn't affect his overall

11:01  11  calculation.  It is quite literally just the expression of his

11:01  12  damage award, which is apportioned to the inventive footprint,

11:01  13  as a dollar-per-listing instead of a percent of 3D revenue.

11:01  14      MR. DACUS:  Just very briefly, Your Honor.  It is -- it's

11:01  15  always interesting to me how the issues sort of get crystalized

11:02  16  in these arguments at long last after having talked about this

11:02  17  stuff for months and months.

11:02  18      And so what counsel just said to you, as she must because

11:02  19  this is what her expert says, is -- and I wrote this in quotes

11:02  20  and I think she said it at least six or seven times -- that the

11:02  21  expert calculated the price premium, the conversions and the

11:02  22  reductions in days -- and this is the important part -- "as a

11:02  23  result of the use of 3D tours," and other times she said "due

11:02  24  to the use of 3D tours."

11:02  25      And that's exactly what their expert did.  That's exactly

11:02  1    a true statement.  The problem is the -- you must apportion the

11:02  2    inventive aspect out of the 3D tour.

11:02  3         The 3D tour includes Matterport-patented technology, it

11:02  4    includes non-patented technology, it includes loads of

11:02  5    technology that was in the prior art, and that's where they

11:02  6    failed.  That's where no technical expert did the work for

11:02  7    them.  They need one more step in their analysis and that's

11:03  8    exactly what they didn't do.

11:03  9         And we don't -- I've already showed the Court that they

11:03 10    admit -- that the expert admits that the measurement function

11:03 11    is not in the patents.

11:03 12         I could show the Court several examples, but on this

11:03 13    dollhouse view that we're talking about, where counsel has told

11:03 14    you that the plaintiff's expert included that in their

11:03 15    valuation, I asked him in his deposition:  Are you aware of any

11:03 16    opinion from Dr. Melendez, the technical expert, as to whether

11:03 17    or not the dollhouse view is covered by the patents-in-suit?

11:03 18         And his answer was:  The dollhouse view is not, in and of

11:03 19    itself, a patented concept.  The idea of a dollhouse view

11:03 20    existed prior to the invention.

11:03 21         So here, again, they're admitting that what they included,

11:03 22    they didn't apportion out the unpatented features.  And I think

11:03 23    that's really where this argument gets crystalized, is they

11:03 24    needed one more step in their apportionment analysis.

11:03 25         Thank you, Your Honor.

11:03   1        MS. GLAUSER:  May I briefly reply, Your Honor?

11:04   2        (Conference between counsel.)

11:04   3        MS. GLAUSER:  Your Honor, I think what's important here is

11:04   4   that this, again, just reflects that there's a dispute about

11:04   5   the apportionment, which goes to the weight, not the

11:04   6   admissibility of Mr. Benoit's testimony.

11:04   7        The immediate paragraph following what Mr. Dacus just read

11:04   8   to you is, "The usefulness of the dollhouse view in enabling

11:04   9   the user of the website to be functionally linked from that

11:04  10   view into the rooms they may want to experience," that is

11:04  11   covered by the patent.

11:04  12        And so the idea that Mr. Benoit attributed some portion of

11:04  13   value related to the dollhouse to be included within the damage

11:04  14   award is appropriate.  And that's because the technical expert

11:04  15   explained that the meaningful use of the dollhouse, based on

11:05  16   the inventive idea of functionally linking that dollhouse to

11:05  17   the 3D model, provided value.

11:05  18        And it's not the case that you extract out every

11:05  19   conventional element and are left then only with the patented

11:05  20   inventive element value.  If you did so, then in any case in

11:05  21   which the patent itself is an inventive or a unique combination

11:05  22   of conventional components, you would be left with zero value.

11:05  23        We're not disputing that dollhouse existed before these

11:05  24   patents.  What's disputed is that the value of the use of

11:05  25   dollhouse as functionally linked to the 3D model is an

| 11:05 | 1 | inventive component.  And that value is something that should |
| 11:05 | 2 | and can be captured in the damage award. |
| 11:05 | 3 | And that's why Mr. Benoit's analysis is proper.  It |
| 11:05 | 4 | follows the case law.  There's no basis to exclude it.  This is |
| 11:05 | 5 | all about weight, not admissibility. |
| 11:06 | 6 | THE COURT:  We'll take about a ten-minute break and I'll |
| 11:06 | 7 | come back. |
| 11:06 | 8 | (Recess taken from 11:06 to 11:19.) |
| 11:19 | 9 | THE COURT:  Thank you.  You may be seated. |
| 11:19 | 10 | The Court is going to deny the motion. |
| 11:19 | 11 | What is -- just because we are -- spent a lot of time on |
| 11:20 | 12 | that and I do want to get as many of these as I can get |
| 11:20 | 13 | reached. |
| 11:20 | 14 | I'll start with Mr. DiNovo.  What motion do you think is |
| 11:20 | 15 | most critical that we take up next from your perspective? |
| 11:20 | 16 | MR. DiNOVO:  Thank you, Your Honor -- I apologize. |
| 11:20 | 17 | THE COURT:  No, no. |
| 11:20 | 18 | MR. DiNOVO:  I'll defer to Mr. Goodpastor who I think is |
| 11:20 | 19 | quite anxious to have his -- |
| 11:20 | 20 | MR. GOODPASTOR:  Your Honor, the Court has had a dispute |
| 11:20 | 21 | over the prior art elections which we recently raised with the |
| 11:20 | 22 | Court.  I'd like to take a moment to address that. |
| 11:20 | 23 | THE COURT:  Okay. |
| 11:20 | 24 | MR. GOODPASTOR:  But it'll affect our preparation for |
| 11:20 | 25 | trial. |

| | | |
|---|---|---|
| 11:20 | 1 | Chris Goodpastor for plaintiff Surefield. |
| 11:20 | 2 | So there are two issues on the final prior art elections, |
| 11:20 | 3 | Your Honor, or identifications as they call them. |
| 11:20 | 4 | The first is the grounds listed in the final |
| 11:20 | 5 | identifications are not the same as any of the grounds in the |
| 11:20 | 6 | preliminary identifications. |
| 11:21 | 7 | And then the second issue is some of the grounds in the |
| 11:21 | 8 | preliminary identifications are not in the invalidity |
| 11:21 | 9 | contentions. |
| 11:21 | 10 | So we issued a standard scheduling order for these types |
| 11:21 | 11 | of disclosures.  You've done it a million times.  The |
| 11:21 | 12 | preliminary identifications must identify prior art grounds |
| 11:21 | 13 | from the invalidity contentions.  And then the final |
| 11:21 | 14 | identifications must select some of those prior art grounds |
| 11:21 | 15 | that were in the preliminaries. |
| 11:21 | 16 | And then to make everything clear and make sure nobody was |
| 11:21 | 17 | mistaken, we defined 'ground' very clearly in the order.  It's |
| 11:21 | 18 | an agreed order.  And it's consistent with what we understand |
| 11:21 | 19 | your rule to be, which is if you're going to present a ground |
| 11:21 | 20 | at trial, it's got to be in the invalidity contentions and the |
| 11:21 | 21 | preliminaries and in the finals.  And if it's not in all three, |
| 11:21 | 22 | it's not coming in. |
| 11:21 | 23 | The problem we ran into, Your Honor, is -- at least the |
| 11:21 | 24 | first problem we ran into is that the grounds in the final |
| 11:21 | 25 | identification are not selected from the grounds in the |

11:21  1    preliminary identification.

11:21  2          And we'll show you -- here's a section of the preliminary

11:22  3    identification relating to Google Street View 2013 System.

11:22  4    This is one of the system references that they've elected.

11:22  5          And I want to make sure it's published.  Okay.

11:22  6          You can see in the preliminaries they elected for Claim 1

11:22  7    of the '885 patent two grounds.  One was Google Street View

11:22  8    2013 as a 102 reference by itself.  The other one was Google

11:22  9    Street View 2013 in combination with the Redfin.com website

11:22  10   reference.

11:22  11         And so we checked this out.  We went back to the final

11:22  12   invalidity contentions.  We looked at their charts, and there

11:22  13   it is in black and white.  Google Street View 2013 System is

11:22  14   claimed as a 102 reference.  And it says, "and we're also going

11:22  15   to claim the following in combination."  And it gives you five

11:22  16   other references that they're going to -- that they're alleging

11:22  17   for their 103 obviousness combinations.

11:23  18         And we looked at it and it said Redfin.com there.  We

11:23  19   said, okay, this one's okay.

11:23  20         Then we got their finals, Your Honor.  And you can see

11:23  21   what's in the final bears no resemblance to what was in the

11:23  22   preliminary.  The final identification for this claim adds 12

11:23  23   additional prior art references to the combination.  They're

11:23  24   highlighted there.

11:23  25         This clearly wasn't disclosed in the preliminary.  Yet

11:23  1   this is what they're contending is their -- now their final

11:23  2   prior art election for Claim 1 of the '885 patent.

11:23  3        None of these grounds were disclosed, and so these should

11:23  4   all be stricken.  They do this for final grounds on 1 through

11:23  5   7, 9 through 18, 20 through 21 and 23 through 28.  None of

11:23  6   these combinations are in the preliminaries.

11:23  7        So what does Redfin say in response?  Well, to the best we

11:24  8   can understand the response, they're claiming that the term

11:24  9   Google Street View 2013 used in the preliminary identifications

11:24  10  doesn't mean the 102 reference that they put in their charts.

11:24  11  It's supposed be some sort of secret shorthand for the 13

11:24  12  reference combination that they've now put in their final

11:24  13  identification.

11:24  14       But this just doesn't make any sense.  And if we look at

11:24  15  this on Slide 6, this is their final invalidity contentions.

11:24  16  It defines Google Street View 2013 System as a 102 reference

11:24  17  that is evidenced by several other materials.  And we point

11:24  18  them out here, the three that are part of the dispute here.

11:24  19       And the charts show the same thing.  If you go back to

11:24  20  Slide 4, it references Google Street View 2013 System as a 102

11:24  21  reference by itself.  Doesn't say anywhere that we're supposed

11:24  22  to understand Google Street View 2013 System means a 13

11:25  23  reference combination.

11:25  24       So these final grounds just assert completely new theories

11:25  25  that weren't disclosed at all in the preliminary

11:25  1  identification.

11:25  2      The second problem we have is the preliminary

11:25  3  identifications themselves.  There are some grounds in there

11:25  4  that aren't selected from the final invalidity contentions.

11:25  5  And we put this in a motion to strike we filed a couple weeks

11:25  6  ago at Document -- ECF Document 181.

11:25  7      I'll go to Slide 8 here, Your Honor.

11:25  8      You can see for the '973 patent, they identified Google

11:25  9  Street View 2013 system as a 102 reference, but they said that

11:25  10  this system is evidenced by a number of documents.  And some of

11:25  11  the documents that they say the system is evidenced by is this

11:25  12  Xiao and Furukawa reference and patents -- and two patents by

11:25  13  Furukawa.

11:25  14      Now, they didn't disclose these as prior art.  They're not

11:26  15  identified as prior art in the invalidity contentions or

11:26  16  anywhere else.  But now when we get the preliminaries, what we

11:26  17  see is they're now claiming that the things that they told us

11:26  18  were only evidence, Xiao and Furukawa and these two Furukawa

11:26  19  patents, are now prior art and part of the prior art

11:26  20  combination.

11:26  21      And this is completely different from not only what

11:26  22  they've told us, but what they told the Court as well.  When we

11:26  23  got Dr. Navratil's report, we were concerned that he was citing

11:26  24  some of these references that were only identified as evidence

11:26  25  as prior art.  And so we included that in our motion to strike,

11:26   1   Your Honor.

11:26   2       And what did Redfin tell us and the Court in response?

11:26   3   They said, don't worry.  We're not using those references as

11:26   4   prior art.  They're only evidentiary support for the Google

11:27   5   Street View System that we've already alleged as prior art.

11:27   6       So now we're in a situation where our expert has responded

11:27   7   to these particular documents as if they were evidence of the

11:27   8   system, and not as if they were prior art.  And the distinction

11:27   9   is critical, Your Honor.  Because when you respond to

11:27   10  something -- when somebody claims that a document is evidence

11:27   11  of a system, well, they have the burden of proof to show that

11:27   12  the functionality described in that document was actually

11:27   13  incorporated into the system that they're claiming existed.

11:27   14      So our expert responded to their initial theory that,

11:27   15  look, we've looked at these documents and there's no evidence

11:27   16  that any of these documents you cite as evidence were ever

11:27   17  incorporated into the Google Street View System.

11:27   18      Now they completely switched their theory, realizing that

11:27   19  they can't prove that the functionality described in these

11:27   20  evidentiary documents was actually implemented in the system.

11:28   21  They said, well, you know what, we're going to switch theories.

11:28   22  And we're going to change these to prior art references.  And

11:28   23  now we don't have to prove they were actually implemented into

11:28   24  the system.  We can just rely on them as prior art references

11:28   25  and avoid that problem altogether.

11:28  1        Well, that's a completely different response from our

11:28  2   perspective.  Because if they allege them as prior art

11:28  3   references in the invalidity contentions, we would have

11:28  4   responded to them with arguments like, hey, there's no

11:28  5   motivation to combine in your report, Dr. Navratil, no

11:28  6   motivation to combine.  And by the way, these secondary

11:28  7   references you've now named as prior art, they don't actually

11:28  8   disclose the claimed system.

11:28  9        But we don't have an opportunity to do that, because they

11:28 10   changed the theory on us after expert reports.

11:28 11        So this same problem exists with the Matterport prior art

11:28 12   systems.  I'm not going to belabor the point, it's in our

11:28 13   briefing.  And it's identified into the particular grounds.

11:28 14        But the problem with the preliminary grounds are all

11:29 15   stated in our proposed order Document 181-4.  So in that

11:29 16   document you'll see how the grounds, the preliminary grounds,

11:29 17   need to be revised to comply with the invalidity contentions.

11:29 18        And so by repeatedly refusing to disclose the prior art

11:29 19   grounds in compliance with the Court's order, we're now here,

11:29 20   sitting ten days after the disclosures were due, with no idea

11:29 21   about what kind of prior art they're going to put on at trial.

11:29 22   We've lost at least ten, maybe more, days of our prep of our

11:29 23   expert because they failed to disclose their prior art

11:29 24   according to the rules.

11:29 25        And the rules are simple, Your Honor, we've all done it.

11:29  1   You go to your invalidity contentions, you find out what you

11:29  2   disclosed there, what combinations are clearly disclosed there.

11:29  3   You put them in your preliminaries and then you take

11:29  4   preliminaries and you put them in your finals.  It's pretty

11:29  5   straightforward.

11:29  6        But they haven't -- they've refused to do that.  We've

11:30  7   been back and forth four different times with them on this.

11:30  8        And so we think you should strike all of the non-compliant

11:30  9   disclosures.  Because we're not confident that if you give them

11:30  10  a chance to correct it, that we're not going to be in front of

11:30  11  the Court again, but now with even less time to prepare our

11:30  12  witnesses.

11:30  13       But if the Court is inclined to allow Redfin to correct

11:30  14  its disclosures, it should be limited to a single ground per

11:30  15  asserted claim selected expressly from the preliminary

11:30  16  identification or prior art as corrected by our proposed order

11:30  17  181-4.  And they should provide the corrected final

11:30  18  identification within one business day.

11:30  19       And this is not going to remedy the prejudice we've

11:30  20  already suffered, but at least it's going to put a cap on it,

11:30  21  Your Honor.

11:30  22       But as we said, our first request is that all of these

11:30  23  non-complied grounds be completely stricken.

11:30  24       Unless there are any questions.

11:30  25       THE COURT:  A response?

11:30  1          MS. CHANG:  Carolyn Chang.

11:31  2          Your Honor, I will agree that there are -- there have been

11:31  3     some confusion over how we characterized disclosures.  And what

11:31  4     it is, I think the two sides disagree on what was required to

11:31  5     be defined -- disclosed.

11:31  6          But I do want to make one thing very clear, that to the

11:31  7     extent that there is any claimed surprise, that's just not

11:31  8     true.  Let me take Google Street View, for example, and some of

11:31  9     the specific combinations that Surefield is claiming has not

11:32  10    been disclosed before and that they never knew it was the

11:32  11    combination.

11:32  12         This is a passage from our technical expert's expert

11:32  13    report.  And now, there were over 120 pages spent on the Google

11:32  14    Street View prior art system in that discussion.  Dr. Navratil,

11:32  15    Redfin's expert, said Google Street View anticipates or in

11:32  16    combination with and in the body of the description discussed a

11:32  17    lot of references.

11:32  18         This is the page before, you'll see it's the Xiao and

11:36  19    Furukawa paper, a '761 patent and there's also an '862 patent.

11:32  20    And at the end -- those were all representing work of

11:32  21    Dr. Furukawa while he was at Google.

11:32  22         And at the end of that, it said it would have been obvious

11:32  23    to combine Dr. Furukawa's work for Google, which is all the

11:33  24    references we just discussed previously, the ones that

11:33  25    Surefield is now complaining that there were no disclosures of,

11:33  1   with Google Street View 2013, that would be the system, to

11:33  2   create synthesized views.

11:33  3        And we said Google did, in fact, combine with -- the work

11:33  4   with Google Street View as a separate project.  So that was our

11:33  5   evidence of motivation to combine.

11:33  6        So there is a specific disclosure of combination.  And

11:33  7   I'll submit to the Court that we did that with all the other

11:33  8   combinations they're complaining about now.

11:33  9        In addition, this fiction of these things not having been

11:33  10  disclosed in our invalidity contentions, I think there's being

11:33  11  an overly technical view of what's being considered and

11:33  12  discussed as what's disclosed in our invalidity contentions.

11:33  13       Our invalidity contentions had incorporated over 76 claim

11:34  14  charts identifying many different primary references in

11:34  15  combinations with different things.  When we elected down to

11:34  16  our first initial, we focused on what would be four of those

11:34  17  things.  So it would be the Google Street View, the Matterport

11:34  18  prior art system and a patent called Uittendaele.

11:34  19       And our intent in our initial was to sort of reduce it

11:34  20  down to say, hey, we're going to focus on what we disclosed in

11:34  21  these initial claim charts.

11:34  22       Now, I will own that there was unclarity on our part in

11:34  23  those initials.  And that is what, as counsel said, we went

11:34  24  back and forth.  And that's what led to the list in the final,

11:34  25  where I'm making clear when I identified that ground I intended

| | | |
|---|---|---|
| 11:34 | 1 | to identify the ground that was in that claim chart which |
| 11:34 | 2 | included citations to all these references.  And that's what I |
| 11:34 | 3 | made clear. |
| 11:34 | 4 | So there is a bit of a not-quite-accurate optics issue |
| 11:35 | 5 | with the longer list in the final, but that was for |
| 11:35 | 6 | clarification of what was intended. |
| 11:35 | 7 | The idea that counsel has not been aware that Google |
| 11:35 | 8 | Street View and the things that we describe and cite and quote |
| 11:35 | 9 | in our invalidity contentions and in over the 120 pages of |
| 11:35 | 10 | further elucidation in Dr. Navratil's report which includes |
| 11:35 | 11 | citations to all the things listed that final identification is |
| 11:35 | 12 | just untrue. |
| 11:35 | 13 | That was -- these reports were served in September. |
| 11:35 | 14 | Counsel claims that they were not able to reply on motivation |
| 11:35 | 15 | to combine in their rebuttal expert report, but they did. |
| 11:35 | 16 | There were discussions of that in the rebuttal expert report. |
| 11:35 | 17 | So at this point I think we are all on the same page about |
| 11:35 | 18 | what we are going to go on trial.  There are three primary |
| 11:35 | 19 | reference, that's the Google Street View 2013, that's the |
| 11:35 | 20 | Matterport 2013 and the this Uittendaele patent. |
| 11:35 | 21 | And I've made clear I intend to rely on the references |
| 11:36 | 22 | cited in those claim charts which I then proceeded to list out |
| 11:36 | 23 | at counsel's request.  So they were clear on what we would be |
| 11:36 | 24 | looking at. |
| 11:36 | 25 | The secondary issue, this idea that some of those |

11:36   1   references describe the primary system and some of them will be

11:36   2   used to be combined with it and that because I said let's take

11:36   3   Reference A evidence as Google Street View, well, there are

11:36   4   disclosures in Reference A and that's the Xiao and Furukawa

11:36   5   paper that describe the Google Street View System.

11:36   6       But there are also disclosures in that, and that's

11:36   7   Dr. Furukawa's work, where he took some stuff from the Google

11:36   8   Street View System and did something additional with it.  And

11:36   9   we made very clear in Dr. Navratil's report, and that's in --

11:36   10  where I showed you here, in passages such as this where we've

11:36   11  extracted out the parts that are Dr. Furukawa's additional work

11:36   12  on top of what was in Google Street View as a system.

11:37   13      And we then concluded and made very clear that these are

11:37   14  going to be combined.  We think that what was in Google Street

11:37   15  View System by itself disclosed.  But Dr. Navratil went on, but

11:37   16  also look at the additional work of Dr. Furukawa, one of

11:37   17  ordinary skill in the art would have known to combine it.

11:37   18      And that is the type of disclosures we have throughout

11:37   19  Dr. Navratil's report and that we are intending to rely on on

11:37   20  our grounds.

11:38   21      (Off-the-record bench conference.)

11:42   22      THE COURT:  So the Court is going to rule -- and part of

11:42   23  the reason for the long discussion is apparently we don't

11:42   24  have -- this hasn't been briefed.  This is an issue that got

11:42   25  raised, and I understand why, and it's something that needs to

11:42  1    be taken up.  So I'll do my best to make my ruling and make it

11:42  2    understandable.

11:42  3         But if -- I think that the final infringement contentions

11:42  4    and the final invalidity contentions are very important.  The

11:42  5    way we do things in my court, you get the -- I'm less concerned

11:43  6    with the change between preliminary and final contentions in

11:43  7    either -- for either side.  That's -- we do preliminary, then

11:43  8    we do the Markman and then we have final contentions.

11:43  9         In my court, I believe the appropriate step for a

11:43  10   plaintiff to take if they want to add something in their expert

11:43  11   report for infringement or if the defendant wants to add a

11:43  12   combination, a 103 combination, in their expert report from

11:43  13   what was in their final invalidity contentions, the appropriate

11:43  14   way to do that is to come to the Court and make sure that they

11:43  15   have permission to do that, absent some agreement to --

11:43  16   specific agreement to be allowed to do it by opposing counsel,

11:43  17   in either direction.

11:43  18        And so the Court is going to prohibit the defendant from

11:44  19   using -- if I understand this correctly, the Court is going to

11:44  20   prohibit the defendant from using any combination -- having the

11:44  21   invalidity expert testify as to any combination, 103

11:44  22   combination, that was not disclosed in the invalidity -- the

11:44  23   final invalidity contentions.

11:44  24        Mr. Goodpastor, does that accomplish what you were

11:44  25   seeking?

11:44  1        MR. GOODPASTOR:  Your Honor, I believe it does, but I just

11:44  2   want to make clear so we don't hop back up here before you

11:44  3   again.  What we believe was disclosed --

11:44  4        THE COURT:  Well, you all discuss what you think is -- you

11:44  5   all can take that up of what -- you all can talk about --

11:44  6   because we got lots to do.

11:44  7        MR. GOODPASTOR:  Okay.

11:44  8        THE COURT:  But I think that -- I understand what I'm

11:44  9   saying.  And what I mean by that is, if you object at trial --

11:45  10  if you all can't come to an agreement as to what's in and

11:45  11  what's out, if you object at trial, the defendant will have the

11:45  12  burden of showing that they disclosed as a 103 combination what

11:45  13  he's testifying in their invalidity contentions for it to be

11:45  14  admitted.

11:45  15       MR. GOODPASTOR:  Understood, Your Honor.  I think that

11:45  16  should do it.

11:45  17       THE COURT:  Before we break for lunch, I'd asked the

11:45  18  plaintiffs to pick something.  I'll switch to counsel for

11:45  19  defendant.  Is there -- what would you all like to take up?

11:45  20       MR. DACUS:  Your Honor, from our perspective, unless we

11:45  21  have miscalculated, we think the remainder of the motions are

11:45  22  plaintiff's motions.

11:45  23       THE COURT:  Okay.  Let me see.

11:45  24       MR. DACUS:  But we may be wrong here.

11:45  25       THE COURT:  I didn't think -- I thought there was

11:46  1   something else, though.  Let me run through them.  I thought

11:46  2   there was one more issue that you all had.  Let me look.

11:46  3          So I assume and maybe I was -- so I -- was your motion for

11:46  4   summary judgment on infringement by a single-story property

11:46  5   subsumed in what was already argued?

11:46  6          MR. MARTON:  Yes.

11:46  7          THE COURT:  I had that broken out separately.  Okay.  So

11:46  8   then --

11:46  9          MR. MARTON:  We have one motion, motion to strike.  It's

11:46  10  Docket 150.  It's motion to strike supplemental Melendez

11:46  11  report.

11:46  12         THE COURT:  I thought that would have been resolved --

11:46  13         MR. MARTON:  That's exactly -- I just wanted to confirm.

11:46  14  I think it's resolved.

11:46  15         THE COURT:  Okay.  Very good.  Okay.  Thank you all.

11:46  16         (Off-the-record bench conference.)

11:46  17         THE COURT:  Okay.  I'm told next I should take up Docket

11:47  18  No. 86.  I say that trusting in my law clerk that there is a

11:47  19  Docket 86, the motion to strike the Melendez report.

11:47  20         (Conference between counsel.)

11:47  21         MS. CHANG:  Your Honor, I believe this was subsumed in a

11:47  22  lot of the motions in limine.  It was about an undisclosed

11:47  23  theory in his expert report.

11:47  24         So if our understanding of it was -- actually, forgive me.

11:47  25  This was a motion for -- there is a theory that was included in

11:48  1   Dr. Melendez' expert report that was not articulated in the

11:48  2   final infringement contentions.  And so we were asking to have

11:48  3   Dr. Melendez' testimony and our opinions stricken with respect

11:48  4   to --

11:48  5        THE COURT:  Special boundaries.

11:48  6        MS. CHANG:  Yeah.  So the issue is the spatial boundaries

11:48  7   being parcel outline.  In Dr. Melendez' expert report he

11:48  8   disclosed a theory about the models being oriented having GPS

11:48  9   coordinates and orienting the models.  And that is how he says

11:48  10  it's -- defines the parcel boundaries.

11:48  11       There's no such theory articulated anywhere in the final

11:48  12  infringement contentions.  They point in the final --

11:48  13       THE COURT:  Counsel, to save time, I think that's right

11:48  14  too.  Unless the plaintiff can persuade me otherwise.

11:48  15       MS. CHANG:  Okay.

11:48  16       MR. DiNOVO:  So, Your Honor --

11:49  17       THE COURT:  I'm sorry to interrupt you.  And, again, I'm

11:49  18  dealing only here with the opinion about how Redfin's products

11:49  19  aligns special boundaries to geographical location and

11:49  20  geographical orientation.  That's the only thing I'm dealing

11:49  21  with right now.

11:49  22       MR. DiNOVO:  Okay.  And so as the Court has expressed

11:49  23  concern about where these lines are, I just want to -- I think

11:49  24  what counsel for Redfin said is entirely accurate in terms of

11:49  25  how this works.  So as I said, the boundaries of the -- the

11:49  1    spatial boundaries, the walls, for example, of the floor or the

11:49  2    rooms are -- have associated GPS coordinates.

11:49  3         And so what we said in our infringement contentions is

11:49  4    that the spatial boundaries of each space define a relative

11:50  5    position of adjacent spaces.  And they are arranged and the

11:50  6    parcel outline is defined relative to the coordinates of the

11:50  7    legal boundaries.

11:50  8         So as I understood their motion, Dr. Melendez uses a term

11:50  9    "orientation," which our view is that orientation is subsumed

11:50  10   if you have -- I could draw it if I were an artist.  But if you

11:50  11   have rooms and floors and you draw them relative to one

11:50  12   another, as this says in our infringement contentions, to

11:50  13   define a property, then the orientation of the property is

11:50  14   thereby defined as well by the GPS coordinates and the location

11:50  15   of each of those boundaries.

11:50  16        And so here's further evidence.  I think it's undisputed

11:50  17   at this point, but all of this source code over on the right

11:50  18   column talks about the GPS coordinates and location data

11:50  19   associated with all of these spatial boundaries.  So we agree

11:50  20   that the word "orientation" did not appear in our infringement

11:51  21   contentions.  But he's simply expressing mathematically the

11:51  22   fact that when you align these, which was expressed, the

11:51  23   relative position of adjacent space is relative to another,

11:51  24   then that is contained.

11:51  25        So we didn't view this -- this is more of a semantic

11:51  1    distinction in our assessment than any sort of mathematical or

11:51  2    substantive distinction.  Because orientation is clearly

11:51  3    encompassed within the infringement contentions.

11:51  4         THE COURT:  Well, then here's what I'm going to do:  I --

11:51  5    it's framed to me as a motion to strike Melendez report.  Give

11:51  6    me one second with my law clerks.

11:51  7         (Off-the-record bench conference.)

11:52  8         THE COURT:  The Court is not going to strike the report

11:52  9    because -- I'm not sure, but I may be doing, in essence, the

11:52  10   same thing here.  I won't know until trial.  So unlike what I

11:53  11   said earlier, the plaintiff can ask the questions you want of

11:53  12   your expert.

11:53  13        With regard to spatial boundaries and geographical

11:53  14   location and geographical orientation, where defendants are

11:53  15   concerned that it was not in the infringement contentions, I

11:53  16   think -- I'm 99 percent sure I agree with that, but I don't

11:53  17   know how to -- I don't know that striking -- I'm just

11:53  18   uncomfortable that I'm doing what I want to accomplish by

11:53  19   striking what's in the report because the jury's not going to

11:53  20   have the report.

11:53  21        So if when Mr. -- I don't know, Mr. DiNovo, who's going to

11:53  22   be putting your expert on, but whoever puts him on --

11:53  23        MR. DiNOVO:  It'll be me, Your Honor.

11:53  24        THE COURT:  Then when you're asking questions in this

11:53  25   area, if I receive an objection from counsel for defendant that

11:54   1   it's not in either -- it's not in the report, but if it's not

11:54   2   in the infringement contentions, you need to be prepared to

11:54   3   show me where it is in the infringement contentions.

11:54   4   Otherwise, I'll sustain the objection and I'll exclude it.

11:54   5       So I agree, generally speaking, with the defendants,

11:54   6   defendant, I don't believe it is sufficiently disclosed in the

11:54   7   infringement contention, but I don't -- I'm not comfortable

11:54   8   that it gives you adequate guidance to say it's stricken from

11:54   9   the report.

11:54   10       But I will take it up -- if you bring it in -- try to

11:54   11   bring it in through your expert, I'll take up -- now, I'm just

11:54   12   trying to think out loud here.  If there's a more efficient way

11:54   13   to do this, I was going to say, you know, for example, before

11:54   14   your witness takes the stand, but that really won't help here.

11:54   15   I mean, you're going to have your witness on the stand for a

11:55   16   long time.

11:55   17       And so whenever this issue comes up, ordinarily I'll tell

11:55   18   lawyers, you know, if you have a specific witness who has some

11:55   19   issue you know is going to come up, we can take it up outside

11:55   20   the jury before that happens.  But that's not going to happen

11:55   21   here because he's going to be on the stand, I would imagine,

11:55   22   for an hour or two.

11:55   23       MR. DiNOVO:  We'll make an effort to direct the questions

11:55   24   to the infringement contention language.

11:55   25       THE COURT:  Okay.  Yeah.  You have to show me in the final

11:55    1    infringement contentions what supports your witness -- and

11:55    2    again, it's not in the same way with invalidity -- well,

11:55    3    invalidity contentions are a little different because we know

11:55    4    what combinations are listed or not.  But with your gentleman,

11:55    5    I'm going to need to be convinced that adequate disclosure was

11:55    6    given to the defendant.

11:55    7        And I will tell you on the record at the moment, I don't

11:55    8    think there was adequate disclosure in your final infringement

11:56    9    contentions.

11:56   10        So I'm going to take a break for lunch.  Tell me this.

11:56   11    What issues do you have -- major issues do you -- have I ruled

11:56   12    on everything the defendants were concerned with, defendant was

11:56   13    concerned with?

11:56   14        MR. MARTON:  Yes, Your Honor.

11:56   15        MR. DACUS:  That covers it all.

11:56   16        THE COURT:  So for plaintiff, what do we have left for

11:56   17    plaintiff?

11:56   18        MS. GLAUSER:  Your Honor, I believe we have two

11:56   19    outstanding motions.

11:56   20        (Clarification by the reporter.)

11:56   21        MS. GLAUSER:  I believe we have two outstanding motions.

11:56   22    The issues within those motions are somewhat -- a few of the

11:56   23    issues within them are subsumed within other rulings, but those

11:56   24    two would be Docket 88, which is Surefield's motion to strike

11:56   25    the Navratil expert report, and then --

| | | |
|---|---|---|
| 11:56 | 1 | THE COURT:  Give me one second. |
| 11:56 | 2 | MS. GLAUSER:  Yep. |
| 11:56 | 3 | THE COURT:  Thank you. |
| 11:56 | 4 | And Navratil is N-a-v-r-a-t-i-l. |
| 11:57 | 5 | MS. GLAUSER:  Yes, Your Honor. |
| 11:57 | 6 | THE COURT:  Okay.  And -- okay.  There's that.  And? |
| 11:57 | 7 | MS. GLAUSER:  The second is Surefield's motion to exclude |
| 11:57 | 8 | Malackowski which is Redfin's damages expert.  That's Docket |
| 11:57 | 9 | 100. |
| 11:57 | 10 | THE COURT:  Okay.  Okay.  So why don't we do this?  If we |
| 11:57 | 11 | can resume at 1:15 and then we'll -- I think I have a little |
| 11:57 | 12 | over -- about an hour and 15 minutes before my next pretrial |
| 11:57 | 13 | hearing.  So let's make sure we get both of those done in that |
| 11:57 | 14 | time. |
| 11:57 | 15 | MS. GLAUSER:  I think that will only leave outstanding, |
| 11:57 | 16 | just to note it for the Court, but Surefield's motion for |
| 11:57 | 17 | summary judgment of no invalidity which is Docket 89, we'll try |
| 11:57 | 18 | to do our best to be quick on the first two to see if we can |
| 11:57 | 19 | get it resolved to bring it up with Your Honor today.  If not, |
| 11:57 | 20 | that would be the outstanding motion that exists after the |
| 11:57 | 21 | hearing today. |
| 11:57 | 22 | THE COURT:  Okay.  Okay.  Very good. |
| 11:57 | 23 | MS. GLAUSER:  Thank you, Your Honor. |
| 11:58 | 24 | (Recess taken from 11:57 to 1:22.) |
| 01:22 | 25 | THE BAILIFF:  All rise. |

01:22  1          THE COURT:  Thank you.  You may be seated.

01:22  2          Okay.  It's my understanding, if I recall from before the

01:23  3     break, it was suggested we take up what's at Docket 88 first;

01:23  4     is that correct?

01:23  5          MR. GOODPASTOR:  Yes, Your Honor.

01:23  6          THE COURT:  Okay.  Happy to do that.

01:23  7          MR. GOODPASTOR:  Thank you, Your Honor.

01:23  8          Chris Goodpastor for plaintiff Surefield.

01:23  9          THE COURT:  Yes, sir.

01:23  10          MR. GOODPASTOR:  The motion to strike the report of

01:23  11     Dr. Navratil actually had three sections.  We're only going to

01:23  12     address one because the other two were, I think, informed by

01:23  13     your decisions on the motions in limine.

01:23  14          And the portion that we're going to address is the motion

01:23  15     to strike Attachment A to the report.

01:23  16          THE COURT:  Yeah.  I was talking to my clerks about that.

01:23  17     I don't understand why -- I'm not following -- I follow why

01:23  18     you're unhappy with -- I get attachment A, he didn't look at

01:23  19     it, he didn't really -- blah, blah, blah, blah.  I get all

01:23  20     that.

01:23  21          Attachment A's not going to come into evidence.  Are

01:23  22     you -- are you worried that he's going to say what's your basis

01:24  23     for that, and he's going to say Attachment A?  I don't

01:24  24     understand why this is a fight.  I don't get it.

01:24  25          MR. GOODPASTOR:  We are worried about that.  Because the

01:24 1   body of the report, Your Honor, doesn't address some of the

01:24 2   references that they've elected that are in Attachment A as --

01:24 3       THE COURT:  So really what you're asking me to do is if

01:24 4   they ask him a question, how does the source code work or

01:24 5   how -- whatever -- how does this work?  And you object and say,

01:24 6   Judge, that's not in his report.  You don't want them to be

01:24 7   able to say it's in Attachment A in the original infringement

01:24 8   contentions.  And the reason that you don't want that to happen

01:24 9   is because he didn't prepare those.  All he did was look at

01:24 10  them.  Is that a pretty fair summary?

01:24 11      MR. GOODPASTOR:  That's exactly right, Your Honor.

01:24 12      THE COURT:  Okay.  So let me hear from counsel.  Do you

01:24 13  intend to -- if you'll come to the podium.

01:24 14      Do you intend to ask any questions of your experts for

01:25 15  which the only basis would be what's in -- there's got to be a

01:25 16  reason you attached it at this point.  So maybe their concern

01:25 17  is right.

01:25 18      Is there any question you're going to ask your expert

01:25 19  where the only basis he would have for giving that opinion is

01:25 20  the infringement contentions?

01:25 21      MR. STEVENS:  Your Honor, Scott Stevens on behalf of

01:25 22  Redfin.

01:25 23      So it very well could be that the attachments provide

01:25 24  additional insight or cite to additional evidence in support of

01:25 25  arguments and positions taken in the body or the prose of the

01:25  1   report.  So there's not some theory that will be found only in

01:25  2   the Appendix A.  But it's entirely possible that there's a

01:25  3   piece of evidence or additional citations within prior art that

01:25  4   might be detailed in Attachment A for which we do intend to

01:25  5   solicit testimony at trial.

01:25  6       THE COURT:  Well, why would attaching that -- attaching

01:26  7   those infringement contentions to the report allow your expert

01:26  8   to opine about what's in them?

01:26  9       Did he rely on them in his report?  Does he cite to them

01:26  10  in his report?

01:26  11      Does -- I'm not -- I understand, I think, generally what's

01:26  12  going on, but I don't understand why we're having this fight at

01:26  13  this point.  So help --

01:26  14      MR. STEVENS:  Sure.  To answer your question, yes, for

01:26  15  everything that we're actually going to be talking about at

01:26  16  trial, our expert did, in fact, cite to those sections.

01:26  17      THE COURT:  Well, he's not going to be telling the jury

01:26  18  about infringement contentions.

01:26  19      MR. STEVENS:  Invalidity.  Sure.

01:26  20      THE COURT:  I'm sorry.  He's not going to be citing

01:26  21  invalidity contentions.

01:26  22      MR. STEVENS:  Correct.  And --

01:26  23      THE COURT:  And so, again, I'm not certain why -- what the

01:26  24  fight is over.

01:26  25      MR. STEVENS:  So let me just make up a hypothetical.

01:26  1       THE COURT:  Okay.

01:27  2       MR. STEVENS:  Let's just say in the body of his report he

01:27  3  discussed a reference, talked through the critical parts of it,

01:27  4  you know, gave these overall theory, but Exhibit A had many

01:27  5  more cites to back up evidence or different ways of looking at

01:27  6  it.  Just like a chart, you know, a pretty easy way to describe

01:27  7  obviously invalidity theories is in a chart.

01:27  8       And so it very well could be that in the body of his

01:27  9  report he explains why he believes the prior art shows

01:27  10  something in our theory of the invalidity argument and then

01:27  11  refers to the chart for there are five more examples of

01:27  12  disclosures.

01:27  13       THE COURT:  How would he at trial refer to the chart?

01:27  14       MR. STEVENS:  Oh, he won't refer to the chart, Your Honor.

01:27  15  I think the question would be, if I asked the expert a

01:27  16  question, then he says, I have two answers for you,

01:27  17  Mr. Stevens.  One is such and such and, two, it's also shown in

01:27  18  Column 7, Lines 1 through 50, of this prior art reference.

01:27  19       It's possible that the first answer he gave comes right

01:27  20  from the body of his report and then the second answer was

01:28  21  additional evidence that was found within Attachment A, again,

01:28  22  for which he's adopted --

01:28  23       THE COURT:  I guess where we're missing is it's not --

01:28  24  that's not a source of evidence that I would admit.  The fact

01:28  25  that he is citing to infringement contentions that you all

01:28  1    prepared is not something I would allow into evidence.

01:28  2         MR. STEVENS:  Correct.  Let me try again.

01:28  3         THE COURT:  Okay.

01:28  4         MR. STEVENS:  My fault.  Let me try again.  The --

01:28  5         THE COURT:  And it's probably me, and I'm just not

01:28  6    understanding, but I'm not understanding.

01:28  7         MR. STEVENS:  So I think it's possible that we could

01:28  8    solicit a question from our expert where he points to a

01:28  9    particular line in a prior art reference.  Not to our chart,

01:28  10   right?  That's not going to happen.  Where he points to a

01:28  11   particular section of a prior art reference.

01:28  12        THE COURT:  Got it.

01:28  13        MR. STEVENS:  That perhaps was only cited or quoted in the

01:28  14   chart in his report.  So, again, on the stand of course he's

01:28  15   not going to speak at all to a chart or any of our invalidity

01:28  16   contentions.  But he might say -- if I said, you know,

01:29  17   Dr. So-and-so, why do you say that this prior art reference

01:29  18   discloses such and such?

01:29  19        It's possible that he says, Mr. Stevens, there's two

01:29  20   answers to your question.  The first answer is blah, blah,

01:29  21   blah, and the second answer, in addition, if you look three

01:29  22   pages further in the reference, it comes up again.  It's

01:29  23   possible that the first part of his answer is in the prose of

01:29  24   his report and --

01:29  25        THE COURT:  Okay.  But the fact that it's in his report is

01:29    1   not going to come into --

01:29    2        MR. STEVENS:  No.

01:29    3        THE COURT:  I'm not following.

01:29    4        MR. STEVENS:  Okay.  I mean, so I'm talking about a prior

01:29    5   art reference.  If an expert is speaking about a reference, not

01:29    6   about a chart, not about his report, right?  What I think the

01:29    7   plaintiff's counsel intends to do is suggest that if I ask a

01:29    8   question that solicits an answer that refers to or quotes or

01:29    9   goes to a small little subset of a prior art reference where

01:29   10   that small subset of the prior art reference is included in

01:30   11   what was the chart to his report as opposed to being thoroughly

01:30   12   discussed in the body of the prose of his report, I'm assuming

01:30   13   that there's going to -- object to that.  I think that's where

01:30   14   the fight lies, Your Honor.

01:30   15        THE COURT:  And where in the report does your expert say

01:30   16   in the report -- my understanding is this was a late-attached

01:30   17   exhibit; is that right?

01:30   18        MR. STEVENS:  I don't believe so, Your Honor.

01:30   19        THE COURT:  So that may be part of my confusion as well.

01:30   20   Was the chart part of his expert report?

01:30   21        MR. MARTON:  Yes.

01:30   22        THE COURT:  And so it was like a glossary, like --

01:30   23   including this.

01:30   24        MR. MARTON:  Yes.

01:30   25        MR. STEVENS:  So that big old binder sitting next to

01:30  1   Ms. Wroblewski is only part of it, but it all came in at the

01:30  2   same time.

01:30  3       THE COURT:  Now I understand.  I'm overruling the

01:30  4   plaintiff's objection.

01:30  5       MR. STEVENS:  Thank you, Your Honor.

01:30  6       THE COURT:  I got it now.

01:30  7       MR. STEVENS:  Your Honor, there was another aspect of this

01:30  8   that was not addressed by --

01:30  9       THE COURT:  But so you know -- just so you'll know, when

01:30  10  you're on direct, the report is -- I can see no reason why the

01:31  11  report gets mentioned by an expert.

01:31  12      Now, on cross, if he says something different here than he

01:31  13  said in his report, I get that.  But the report doesn't exist

01:31  14  on direct as far as I'm concerned, if that makes sense.

01:31  15      MR. DACUS:  It does.

01:31  16      MR. STEVENS:  I think it makes perfect sense, Your Honor.

01:31  17      THE COURT:  Well, I thought so too, but --

01:31  18      (Laughter.)

01:31  19      THE COURT:  -- I've been through a lot of trials now where

01:31  20  apparently there was confusion either on my part or the

01:31  21  lawyers, so I thought I'd say it in advance.

01:31  22      MR. STEVENS:  If you see us putting Appendix A up at the

01:31  23  trial, you can remind me of what I just said, but it's not

01:31  24  going to happen.

01:31  25      THE COURT:  It's like I tell the jury, for example, when I

01:31  1   tell them that they can't Google things or post things on

01:31  2   social media and they ask me why am I giving them that

01:31  3   instruction, and I tell them it's because people have Googled

01:31  4   things and posted things on social media during the trial.

01:31  5   That's why I have to tell them not to do that.

01:31  6        So okay.  Now -- but thank you for that.  It took longer

01:32  7   than it should have.  Maybe I'm just slow after lunch, but I

01:32  8   understand what you're saying now.

01:32  9        What is the next issue we need to take up?

01:32  10       MR. STEVENS:  There was another aspect of this motion that

01:32  11  I believe counsel indicated might have been subsumed by MILs.

01:32  12  That wasn't 100 percent clear to me.

01:32  13       And so if Your Honor would indulge me just for a moment, I

01:32  14  would like to seek clarification of that.

01:32  15       THE COURT:  Sure.

01:32  16       MR. STEVENS:  So in Dr. Navratil's report, there are

01:32  17  discussions about the Matterport system and its development

01:32  18  over time and how it existed at various points in time.

01:32  19       This is not in a section that relates to invalidity or

01:32  20  noninfringement.  It's just in a section that is telling the

01:32  21  history of the Matterport system, what's happened over time and

01:32  22  then and now.

01:32  23       There were some objections to that in this particular

01:32  24  motion to strike.  I don't believe that is subsumed within the

01:33  25  MIL, and I would seek some clarification with that, if I can,

01:33  1    from the Court.

01:33  2        THE COURT:  Yeah.  Help me out, which one you're talking

01:33  3    about.

01:33  4        MR. STEVENS:  Yes, sir.  So it's the same motion.

01:33  5        THE COURT:  Yes.

01:33  6        MR. STEVENS:  I believe it was THE second or third part in

01:33  7    the motion, the third part of the motion.  It's under the sort

01:33  8    of heading of comparisons with the prior art.

01:33  9        THE COURT:  Okay.

01:33 10        MR. STEVENS:  But as we actually see it in the reports,

01:33 11    that's not exactly what's happening.  And, again, that's why I

01:33 12    believe this to be a separate and distinct issue from the MIL

01:33 13    that you discussed earlier.

01:33 14        THE COURT:  To the extent the plaintiff is asking me to

01:33 15    strike those comparisons, I'm going to deny that.  I'm going to

01:33 16    overrule that motion.

01:33 17        MR. STEVENS:  Thank you, Your Honor.  Appreciate the

01:33 18    clarification.

01:33 19        THE COURT:  Now, I have here that there was also an issue

01:33 20    about indefinite argument -- indefiniteness arguments that

01:33 21    contradict the Markman order.  Is that an issue we need to take

01:33 22    up?

01:33 23        MR. STEVENS:  It's the best type of issue because it's

01:33 24    moot, Your Honor.

01:33 25        THE COURT:  Okay.  Now, what motion next should we take

01:34  1  up?

01:34  2       MS. GLAUSER:  With Your Honor's permission, I think we are

01:34  3  to Surefield's motion to exclude Malackowski's testimony which

01:34  4  is Docket 100.

01:34  5       THE COURT:  Okay.

01:34  6       MS. GLAUSER:  And I think as I foreshadowed before, a

01:34  7  number of the issues have already been addressed by Your

01:34  8  Honor's MIL rulings.  So the two issues -- three issues that

01:34  9  I'd like to address from the Daubert motion are

01:34  10  Mr. Malackowski's economic comparability analysis with regard

01:34  11  to certain prior license agreements or license offers.  And

01:34  12  then Mr. Malackowski's reliance on Matterport patents.

01:34  13       So turning to the first issue --

01:34  14       THE COURT:  I think if I have this on my chart right, the

01:34  15  first issue's Part E.  Is what I have down as Part E of the --

01:35  16  of the --

01:35  17       MS. GLAUSER:  Your Honor, if I may grab the motion, I have

01:35  18  it written on my notes.

01:35  19       THE COURT:  Okay.  Yeah.  It'd help me a lot if I can

01:35  20  track --

01:35  21       MS. GLAUSER:  To the table of contents.

01:35  22       So the first would be Part B of the motion that

01:35  23  Malackowski's rate should be excluded because he performed no

01:35  24  comparability analysis regarding the 2014 Matterport agreement.

01:35  25       THE COURT:  I don't have that on my chart at all, I don't

01:35  1  think.  Let me see.

01:35  2      Okay.  Got it.  Okay.

01:36  3      MS. GLAUSER:  The second is Part C which is that

01:36  4  Malackowski's rate should be excluded because he performed no

01:36  5  comparability analysis regarding Zillow's 2020 offer to

01:36  6  Surefield.

01:36  7      THE COURT:  And do I -- and then with regards to the other

01:36  8  parts, you believe those have already been resolved by what

01:36  9  I've done in other -- on other issues?

01:36  10     MS. GLAUSER:  Or at least that they'll be taken up at

01:36  11  trial when it comes up.

01:36  12     THE COURT:  Okay.  I got it.

01:36  13     MS. GLAUSER:  Yes, Your Honor.

01:36  14     THE COURT:  So let's take up Part C, Mr. -- it's

01:36  15  M-a-l-a-c-k-o-w-s-k-i -- Mr. Malackowski's --

01:36  16     MS. GLAUSER:  Yes.  I pronounce it "Malackowski," which I

01:36  17  think is correct.

01:36  18     MR. MARTON:  That's correct.

01:36  19     THE COURT:  Mr. Malackowski's testimony regarding Zillow's

01:36  20  2020 offer as corroborative.  I'll hear from -- I'll hear from

01:36  21  you on that one.

01:36  22     MS. GLAUSER:  Okay.  Great.  Your Honor, in

01:36  23  Mr. Malackowski's report, he performs no economic comparability

01:36  24  analysis between the Zillow 2020 offer and the hypothetical

01:36  25  license that would result here.  I asked him at his deposition

01:37  1    what the basis was for his comparison between the two, and his

01:37  2    answer was simply that it's based on his years of experience

01:37  3    and the fact that a company like Zillow wouldn't make such an

01:37  4    offer if they didn't find that the patent lacked certain value

01:37  5    or at least that their offer would be reflective of the value.

01:37  6         And that kind of expert opinion with regard to a prior

01:37  7    license or prior license offer is routinely excluded as lacking

01:37  8    the required economic comparability.

01:37  9         There is zero evidence in Mr. Malackowski's report

01:37  10   attempting to analyze whether Zillow even used Surefield's

01:37  11   patents, whether it used it on one listing or a thousand

01:37  12   listings.

01:37  13        In addition, the Zillow offer was a lump-sum offer of

01:37  14   $300,000 to acquire the Surefield patents.  And the Federal

01:37  15   Circuit has repeatedly ruled that when a hypothetical license

01:37  16   is to be structured as a running royalty, which both experts

01:38  17   agree here that the license in this case would be a running

01:38  18   royalty, that in order to rely on prior licenses that are

01:38  19   structured as a lump sum, the expert must provide some basis

01:38  20   for the jury to convert that lump-sum amount into a running

01:38  21   royalty.

01:38  22        And none of that economic analysis is set forth in

01:38  23   Mr. Malackowski's report and he confirmed at his deposition

01:38  24   that he, in fact, did not have any of that data.

01:38  25        And for that reason, in addition to the fact that it's

01:38  1   simply an offer and not actually an executed license, we

01:38  2   believe that Mr. Malackowski's testimony regarding this

01:38  3   particular Zillow offer should be excluded.

01:38  4       THE COURT:  Response?

01:38  5       MR. DACUS:  So at the outset, Your Honor, I think it's

01:38  6   important to make sure we have all the facts here.  So Zillow

01:38  7   is a competitor to Redfin.  Same business, they're in the

01:39  8   online real estate business.

01:39  9       Zillow made an offer that for the patents-in-suit, the

01:39  10  very patents that we're talking about here, to the patent owner

01:39  11  for 350,000.  So we're not in a situation like a lot of the

01:39  12  cases they cite where we're talking about are the -- is the

01:39  13  technology similar?  We're talking about an offer from someone

01:39  14  in the same shoes as Redfin for the very patents-in-suit here.

01:39  15      And what Mr. Malackowski says is that is a piece of

01:39  16  evidence, a relevant piece of evidence under the

01:39  17  Georgia-Pacific factors.  Of course, under both 1 and 2 we're

01:39  18  supposed to look at licenses or other transactions that reflect

01:39  19  the value of the patents-in-suit.  And so all Mr. Malackowski,

01:39  20  the expert, says is that is a piece of evidence that we should

01:39  21  look to to determine the value of the patents.  It's no more

01:39  22  complicated than that.  It's not determinative of his ultimate

01:39  23  royalty rate.  But it is a piece of evidence to review.

01:40  24      Thank you, Your Honor.

01:40  25      THE COURT:  I'm going to grant the motion on Part C.

01:40    1          I'm going to deny the motion with regard to Part B.

01:40    2          And so what else do we have to take up?

01:40    3          MS. GLAUSER:  The other portion, Your Honor, was Part G

01:40    4    which is Malackowski's testimony regarding Matterport's patent

01:40    5    portfolio.

01:40    6          And Your Honor has already ruled that third-party patents,

01:40    7    including the Matterport patents, aren't to come in unless the

01:40    8    parties first approach the bench.  That's the ruling on

01:40    9    Surefield's Motion in Limine No. 16.

01:40    10         On this particular issue, though, we know how

01:40    11   Mr. Malackowski intends to use Matterport's patent portfolio.

01:41    12   Because in his expert report he states that Matterport has

01:41    13   40-plus patents and then further describes that many relate to

01:41    14   3D virtual tours and are --

01:41    15         THE COURT:  Yeah.  Let me hear from counsel -- I don't

01:41    16   know if it's Mr. Dacus or whoever -- on why these should be

01:41    17   allowed in.

01:41    18         MR. DACUS:  So I'm sad to announce that this issue goes

01:41    19   directly to my recently-denied Daubert motion on apportionment,

01:41    20   Your Honor.

01:41    21         So as the Court knows, and we belabored this morning, for

01:41    22   apportionment, part of the thing that the plaintiff, from our

01:41    23   view, needs to apportion out is other people's patented

01:41    24   technology.  So here this technology that Redfin purchases

01:41    25   comes from Matterport.  Matterport has a number of its own

01:41  1  patents.  And it's the plaintiff's burden to apportion that

01:41  2  patented technology out of the value of its reasonable royalty.

01:42  3  Which, of course, we believe it's not done.

01:42  4       So that would be the reason -- and I want to be clear.  No

01:42  5  one is going to say -- and I know this is the Court's concern

01:42  6  that we do not infringe because Matterport has patents.  This

01:42  7  is an issue that relates to apportionment.

01:42  8       THE COURT:  Okay.  I'm going to grant the motion with

01:42  9  respect to excluding that, the Matterport, M-a-t-t-e-r-p-o-r-t,

01:42  10 patent portfolio as well.

01:42  11      Are there any issues to take up?

01:42  12      MS. GLAUSER:  It's a related issue to Malackowski's

01:42  13 testimony, but it's actually part of Docket 82 rather than

01:42  14 Docket 100.

01:42  15      And Docket 82 is Surefield's motion to exclude certain

01:42  16 expert opinion and testimony relating to noninfringing

01:42  17 alternatives.

01:42  18      THE COURT:  I'm going to deny that.

01:42  19      Any other motions?

01:42  20      MR. GOODPASTOR:  I don't believe so, Your Honor.  We can

01:42  21 rest on the papers on Docket 89.

01:43  22      THE COURT:  Okay.  Give me one second and let me make sure

01:43  23 I have 89.  Oh, here we go.

01:43  24      Court's going to deny that motion as well.

01:43  25      Is there anything else we need to take up?

01:43  1        MS. GLAUSER:  Not from plaintiff, Your Honor.  Thank you

01:43  2  very much.

01:43  3        MR. DACUS:  Not from our perspective.

01:43  4        THE COURT:  I have plaintiff's motion for leave to file a

01:43  5  motion for summary judgment on PTAB decisions.  I'm going to

01:43  6  deny that as well.

01:43  7        I think that gets everything, correct?

01:43  8        MR. DiNOVO:  I think that's right, Your Honor.

01:43  9        MR. DACUS:  Yes, Your Honor.

01:43  10        THE COURT:  Okay.

01:43  11        (Off-the-record bench conference.)

01:43  12        THE COURT:  So my law clerks are much more worried about

01:45  13  your calendars than I am.  I'm kidding.  I'm very concerned

01:45  14  too.

01:45  15        Here's the problem we're having with my schedule.  We

01:45  16  think that the trial the week before y'all's is going to go

01:45  17  over into y'all's trial week.  And then that week, y'all's

01:46  18  trial week, I have to go on Thursday and Friday to the Fifth

01:46  19  Circuit conference.  So what I would recommend we do is we set

01:46  20  this for May 9th, the following week.  And you all would have

01:46  21  the whole week.

01:46  22        MR. DACUS:  May I raise one issue, Your Honor?

01:46  23        THE COURT:  Sure.

01:46  24        MR. DACUS:  I apologize.  My youngest child, my daughter,

01:46  25  is graduating from that maroon university about 90 miles down

01:46   1    the road on that Friday the 13th.  And I would desperately like

01:46   2    to be there.

01:46   3         THE COURT:  Well, I can --

01:46   4         MR. DACUS:  I know you don't hold that institution in as

01:46   5    high a regard as you should, but my wife does.

01:46   6         THE COURT:  Well, my wife is an Aggie and my stepson

01:46   7    starts at A&M in August.  So I will take no position.  However,

01:47   8    we will -- I can accommodate making sure you're -- what time is

01:47   9    it?

01:47   10        MR. DACUS:  It's at 10:00 a.m. on Friday.

01:47   11        THE COURT:  Oh.  10:00 a.m. on Friday.  What do we have

01:47   12   the following week?

01:47   13        (Off-the-record bench conference.)

01:47   14        MR. DACUS:  And I'm not suggesting that we can't do

01:47   15   anything that week, Your Honor.  I want to be clear, I'm just

01:47   16   suggesting --

01:47   17        THE COURT:  No, no, no.  I understand.

01:47   18        MR. DACUS:  -- I'd like to be in College Station at

01:47   19   10:00 a.m. on Friday morning.

01:47   20        THE COURT:  I couldn't -- I fully understand that.  How

01:47   21   many patents are in -- four patents in the case, right?  One

01:47   22   plus three.

01:47   23        MR. DACUS:  One thing we could --

01:47   24        (Off-the-record bench conference.)

01:47   25        THE COURT:  Okay.  Mr. Dacus, if you weren't my favorite,

01:48   1   I would -- no.  I would do this for anyone who's at counsel

01:48   2   table.  What we'll plan on doing is we'll start the 9th.  We

01:48   3   will go as long as we need to through the 12th.  And then we

01:48   4   will resume on Monday the 16th.  Does that work?

01:48   5        MR. DACUS:  It certainly does for me, Your Honor.  I very

01:48   6   much appreciate the accommodation.

01:48   7        THE COURT:  Okay.  Now, what may happen, which I don't

01:48   8   think you'll necessarily need to be here for, is I might want

01:48   9   to do the jury charge on the 13th.  But I assume one of the

01:48   10  assembled people on your team could help me with the jury

01:48   11  charge if necessary.

01:48   12       MR. DACUS:  My impression of the jury charge is the smart

01:48   13  lawyers are required and that probably excludes me from the

01:48   14  room.

01:48   15       THE COURT:  Unfortunately, for the smart lawyers, they

01:48   16  have to talk to me, and so -- which is where the real -- is the

01:49   17  real gap.

01:49   18       So we will start on the 9th and go through the 12th.

01:49   19       Who -- when are we picking the jury?

01:49   20       (Off-the-record bench conference.)

01:49   21       THE COURT:  Okay.  So it's clear, while I'm at the Fifth

01:49   22  Circuit conference on Thursday, the 5th, we'll be picking the

01:49   23  jury on Thursday.  You all will be picking the jury on

01:49   24  Thursday, the 5th, with one of my two magistrate judges.

01:49   25       And so that means that on the 9th at 9:00 a.m., whatever

01:49  1    they do, look at the video, get the charge read, all that stuff

01:49  2    will happen.  And on the 9th at 9:00 a.m., we'll be giving

01:49  3    opening arguments.

01:49  4         Yes, sir.

01:49  5         MR. MARTON:  Your Honor, this schedule works fine with the

01:49  6    attorneys on this side; however, we have to confirm with our

01:49  7    experts and witnesses.

01:49  8         THE COURT:  Well, I would tell them that they probably

01:50  9    need to be here.

01:50  10        MR. MARTON:  All right.

01:50  11        (Laughter.)

01:50  12        THE COURT:  So -- and by the way, I don't mean to be

01:50  13   cavalier.  If we need to -- if they've made commitments where

01:50  14   we need to do something out of order or do something else, let

01:50  15   me know.  I also have -- I also allow, if it's -- for any

01:50  16   witness, they can attend by Zoom as well.  And so...

01:50  17        Anything else we need to take up?

01:50  18        MR. DiNOVO:  Nothing from plaintiff.

01:50  19        MR. DACUS:  No, Your Honor.  Thank you.

01:50  20        THE COURT:  If you don't know, we'll have -- you'll have

01:50  21   30 minutes per side for opening arguments.

01:50  22        When I started this job, one of the statements I made --

01:50  23   most of what I said before I started this job has not been long

01:50  24   lasting.  I said I would never put time limits on the lawyers

01:50  25   during the trial.  That lasted exactly one trial.

01:51  1        So I look forward to seeing you all.  I look forward to

01:51  2    seeing you all on the 9th.  And if anything comes up between

01:51  3    now and then --

01:51  4        Regan is this your -- ok.

01:51  5        If anything else between now and then, check with Regan

01:51  6    and we can help y'all out.

01:51  7        (Hearing adjourned at 1:51 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT )

2  WESTERN DISTRICT OF TEXAS   )

3

4      I, Kristie M. Davis, Official Court Reporter for the

5  United States District Court, Western District of Texas, do

6  certify that the foregoing is a correct transcript from the

7  record of proceedings in the above-entitled matter.

8      I certify that the transcript fees and format comply with

9  those prescribed by the Court and Judicial Conference of the

10  United States.

11      Certified to by me this 30th day of March 2022.

12
                        /s/ Kristie M. Davis
13                      KRISTIE M. DAVIS
                        Official Court Reporter
14                      800-Franklin Avenue
                        Waco, Texas 76701
15                      (254) 340-6114
                        kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25